Janet **GOTKIN** and Paul Gotkin, Individually and on behalf of all persons similarly situated, Plaintiffs,

v.

Alan **D. MILLER**, Individually and as Commissioner of Mental Hygiene of the State of New York, et al., Defendants.

No. 74–C–584.

United States District Court,
E. D. New York.

July 24, 1974.

Bruce J. Ennis, New York Civil Liberties Union and Mental Health Law Project, Christopher A. Hansen, Mental Health Law Project, New York City, for plaintiffs.

Louis J. Lefkowitz, Atty. Gen. of the State of New York, New York City, for defendants, Alan D. Miller, Commissioner of Mental Hygiene of the State of New York, and Morton B. Wallach, Director of Brooklyn State Hospital; Samuel A. Hirshowitz, First Asst. Atty. Gen., Maria L. Marcus, Asst. Atty. Gen., of counsel.

Lippe, Ruskin & Schlissel, P. C., Mineola, N. Y., for defendant, Charles J. Rabiner, Director of Hillside Medical Center; Melvyn B. Ruskin, Michael L. Faltischek, Mineola, N. Y., of counsel.

Goldwater & Flynn, New York City, for defendant, Marvin Lipkowitz, Director of Gracie Square Hospital; George Kossoy, Robert Conrad, New York City, of counsel.

## DECISION AND ORDER

TRAVIA, District Judge.

On several occasions between 1962 and 1970, the plaintiff Janet Gotkin was a voluntary mental patient at Brooklyn State Hospital, Long Island Jewish-Hillside Medical Center and at Gracie Square Hospital. The precipitating cause for many of these voluntary hospitalizations was a series of threatened suicide attempts. It is alleged that since September of 1970, the plaintiff Janet Gotkin has not been hospitalized or treated for any mental disorder.

Janet Gotkin and her husband, Paul Gotkin, have co-authored a book, which is to be published by Quadrangle Books in late 1974 or early 1975, dealing with Janet Gotkin's experiences with psychiatry and, more specifically, with her medical treatment at the aforementioned hospitals. In an attempt to verify some

of the factual data contained in this book[1] and to compare her recollection of certain incidents with the hospitals' version of what had transpired, the plaintiff Janet Gotkin wrote to the various hospitals where she had been treated and requested access to any medical records which might relate to her. Each of these hospitals, however, refused to grant the plaintiff's request.

On April 16, 1974, the plaintiffs, Janet and Paul Gotkin, commenced the instant action, on behalf of themselves as well as on behalf of all other former mental patients who had similarly requested and were denied access to their hospital medical files, against Alan D. Miller (the Commissioner of the New York Department of Mental Hygiene), Morton B. Wallach (the Director of Brooklyn State Hospital), Charles J. Rabiner (the Director of the Hillside Medical Center)[2] and Marvin Lipkowitz (the Director of Gracie Square Hospital). Jurisdiction for the action is predicated upon the statutory provisions of the Civil Rights Act, Title 42 U.S.C. § 1983 and Title 28 U.S.C. § 1343.[3] The gravamen of the plaintiffs' complaint is that the defendants' refusal to grant the plaintiffs access to the requested medical records constituted a deprivation of the plaintiffs' rights under the First, Fourth, Ninth and Fourteenth Amendments to the United States Constitution.

As a consequence of these alleged constitutional deprivations, the plaintiffs request this court to:

(1) determine that this action may proceed as a class action;

(2) issue a judgment declaring that defendants' rules, regulations, customs, policies and practices, under which all former patients are denied the right to examine their own hospital records, are unconstitutional;

(3) issue a preliminary and permanent injunction enjoining the defendants and their agents and successors from enforcing said rules, regulations, customs, policies and practices;

(4) issue a judgment declaring that all former patients have the right upon demand to examine and copy their own hospital records unless within a reasonable time after such demand the person having custody of the records applies for and thereafter obtains a court order denying access to the records; and

(5) issue a preliminary and permanent injunction requiring the defendants immediately to allow the plaintiffs to inspect and copy plaintiff Janet Gotkin's complete hospital records at Brooklyn State, Hillside and Gracie Square Hospitals.

On May 14, 1974, the state defendants, i. e., Alan D. Miller and Morton B. Wallach,[4] made application to this court for an order granting summary judgment in their favor and against the plaintiffs, pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, upon the grounds that there exists no genuine issue of fact to be tried and that they are entitled to judgment as a matter of law. On June 3, 1974, the defendant Marvin Lipkowitz made a similar application for summary judgment and in addition made an alternative motion for

1. The factual data sought by the plaintiff Janet Gotkin included dates of admission, drug dosages, diagnoses, dates of shock treatments and test results.

2. Plaintiffs erroneously named Dr. Rabiner as the Director of the Hillside Medical Center. Actually, the hospital's proper title is Long Island Jewish-Hillside Medical Center and Dr. Rabiner is not its Director, but is rather the Chairman of the Psychiatry Department.

3. Plaintiffs also refer to Title 28 U.S.C. § 2201 as a basis for jurisdiction. This section, commonly referred to as the "Declaratory Judgment Act," is not an independent grant of jurisdiction in the federal courts; it simply makes available an additional remedy when another jurisdictional predicate exists. See C. Wright, Federal Courts 449 (2d Ed. 1970).

4. Mr. Wallach is the Director of Brooklyn State Hospital, which is classified as a Department of Mental Hygiene facility under Section 7.15 of the New York Mental Hygiene Law, McKinney's Consol.Laws, c. 27.

the dismissal of the plaintiffs' action, under Rule 12(b)(1) of the Federal Rules of Civil Procedure, on the ground that this court lacks jurisdiction of the subject matter of the present action because the defendant is purely a private person whose actions with respect to the plaintiffs give rise to no federal constitutional rights. Subsequently, the defendant Charles A. Rabiner also moved for a dismissal of the action, pursuant to Rule 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure on the grounds that the facts fail to show that a constitutional deprivation has occurred or that Hillside Medical Center's actions were under color of state law.[5]

█ From the outset, it should be observed that the plaintiff Paul Gotkin is not a proper plaintiff to this action. Nowhere in the complaint or in the plaintiffs' papers and memoranda has it been alleged that he was ever a mental patient at any of the defendant hospitals.[6] Nor has it been alleged that Paul Gotkin ever requested and was refused access to either his or his wife's medical records. Therefore, it cannot even be asserted that Paul Gotkin is a member of the class he now purports to represent.

█ The standard for determining whether a Civil Rights complaint should be dismissed is a rather narrow one and the courts have been generally loath to dismiss such an action, unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *See* Jenkins v. McKeithen, 395 U.S. 411, 422, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969); Holmes v. New York City Housing Auth., 398 F.2d 262 (2d Cir.

1968). Yet, it has been uniformly held that in order to successfully maintain a cause of action under the Civil Rights Acts, a plaintiff must demonstrate: (1) that he has been denied a right, privilege or immunity secured by the Constitution and the laws of the United States; (2) that it was the defendants who subjected him to the deprivation complained of; and (3) that the defendants acted under color of state law. *See, e. g.,* Kletschka v. Driver, 411 F.2d 436 (2d Cir. 1969); *see also* Adickes v. S. H. Kress & Co., 398 U.S. 144, 150, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); Johnson v. Capital City Lodge No. 74, Fraternal Order of Police, 477 F.2d 601 (4th Cir. 1973). Therefore, one of the central issues now confronting this court is whether a hospital's refusal to grant a former mental patient access to its medical records constitutes a violation of that former patient's constitutional rights. The question is decidedly one of first impression and since its resolution is pivotal to the plaintiffs' right to proceed here, this court will closely scrutinize each of the plaintiffs' claims of constitutional deprivation.

### FIRST AMENDMENT CLAIM

Plaintiffs' claim of abridgement under the First Amendment is essentially founded upon a line of Supreme Court decisions which ostensibly recognizes an individual's "right to information and ideas."[7] Although it is beyond cavil that such a right does exist, this court believes that its tenets are totally inapplicable to the facts presented herein.

The "right to receive information and ideas" has always been used as a neces-

---

5. The defendant Rabiner additionally requests this court to abstain from exercising jurisdiction in the present action. Suffice it to say that abstention in Civil Rights actions "may be invoked only in a narrowly limited set of special circumstances," Holmes v. New York City Housing Auth., 398 F.2d 262 (2d Cir. 1968).

6. In her letter of October 31, 1973 to the Director of Brooklyn State Hospital, the

plaintiff, Janet Gotkin, admits that her husband is not an ex-mental patient.

7. Although the plaintiffs' complaint fails to specify which of the many constitutional rights under the First Amendment have been abridged, their Memorandum of Law in Opposition to the Motion for Summary Judgment more clearly delineates under which right the plaintiffs seek protection.

sary corollary to the right of free speech. A "speaker's" right to voice his opinions on public and controversial issues without restraint would be an empty freedom if the government could impose restrictions upon his audience's right to hear what he had to say. Thus, in Thomas v. Collins, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430 (1945), the Court struck down a state law which required the registration of labor organizers before they attempted to recruit union membership. In so holding, the Court explicitly recognized the labor organizer's right to speak and the workers' corresponding right "to hear what he had to say." *Id.* at 534, 65 S.Ct. at 324. Similarly, in Lamont v. Postmaster General of the United States, 381 U. S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965), the Court found a statute, which permitted the government to hold "communist political propaganda" arriving in the mails from abroad unless the addressee affirmatively requested in writing that the material be delivered to him, to be unconstitutional. The rationale for this opinion stemmed from the unjustified burden the statute placed upon the addressee's right to receive ideas.

■■ Outside the sphere of public or controversial issues, the "right to receive information and ideas" loses much of its vitality and justification. Moreover, the "right to receive information" has never been used by the courts as a constitutional cudgel to compel an unwilling "speaker" to impart information or ideas to any individual who requests him to. As one eminent authority has observed, the "right to hear" has only been recognized in situations where: (1) the speaker is discussing public figures, issues or other matters of social importance; (2) the speaker desires to be heard; and (3) the listeners have been given an opportunity to leave or ignore the speaker. *See* Forkosch, Freedom to Hear: A Political Justification of the First Amendment, 46 Wash.L. Rev. 311 (1971). Thus, plaintiffs' attempt to invoke the "right to receive information" in the context of this case,

would seem to be an overly broad extension of the right and an unprecedented interpretation of the First Amendment.

■ Although not raised by the plaintiffs, a question may still arise as to whether the hospitals' refusal to permit the plaintiffs access to plaintiff Janet Gotkin's medical records was tantamount to a prior restraint of the right to freedom of speech or freedom of the press. This court thinks not. Plaintiffs have already completed the first draft of their book and the defendants in no way have attempted to restrict the content of that book or halt its publication.

\FOURTH AMENDMENT CLAIM

■ Plaintiffs' contention that the defendants' actions violated the Fourth Amendment's proscription against "unreasonable searches and seizures," is, to say the least, a novel argument. Although courts have held that the safeguards of the Fourth Amendment are not wholly confined to criminal actions, *see, e. g.,* Laprease v. Raymours Furniture Co., 315 F.Supp. 716 (N.D.N.Y. 1970), the application of the Fourth Amendment in a civil context has usually been confined to replevin actions where a creditor has repossessed chattels in the possession of a debtor. The present action is not even remotely similar. Here, *possession* and *ownership* of the medical records has always remained with the hospitals and there has been no "seizure" in a constitutional sense. Moreover, even assuming *arguendo* that the hospitals' retention of their own records is to be construed as a "seizure," it cannot seriously be argued that it was an unreasonable one.

NINTH AMENDMENT CLAIM

■ Plaintiffs advance the claim that the refusal to permit former mental patients an opportunity to inspect and copy the hospitals' medical records which pertain to them amounted to an intrusion of their "right to privacy" under the Ninth Amendment. Such a claim is patently without merit. This

court fails to see how the "right of privacy" is in any way germane to the facts presented herein. It would be an entirely different matter if one of the defendants was attempting to publish material which referred to the plaintiff Janet Gotkin; then, invocation of the Ninth Amendment would have some justification. But such is not the case and this court cannot visualize how the withholding of an undisputably confidential medical record constituted a deprivation of the plaintiffs' right to privacy.

It is possible that the records sought here contain references to and statements by other mental patients, which are entitled to some degree of confidentiality. Given the fact that the plaintiffs' purpose for requesting these records is to publish a book, it is ironic that plaintiffs' success in this action could conceivably violate the very right to privacy which the plaintiffs rely upon.

## FOURTEENTH AMENDMENT CLAIM

A more intricate question to be resolved by this court is whether the defendants' actions constituted a deprivation of plaintiffs' property without due process of law. Such a claim is necessarily dependent upon a threshold finding that former mental patients have a property interest in hospital medical records concerning them. The establishment of any property interest is substantially the result of state, rather than constitutional, law. As the Supreme Court in Board of Regents of State Colleges v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972), articulated:

"Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."

Therefore, in order to assert a property interest in a hospital record, a former patient must demonstrate some legitimate claim of entitlement to it under state or contractual law.

Turning first to the statutory law of New York, this court is unable to discern a single legislative enactment which even implicitly recognizes a former mental patient's entitlement to hospital records concerning him. The only statute which relates to the disclosure of a mental hospital's medical records, Section 15.13 of the Mental Hygiene Law, would seem to indicate that patients or former patients are precluded from gaining direct access to their records. That section provides:

"§ 15.13 *Clinical records; confidentiality*

(a) A clinical record for each patient shall be maintained at each facility. The record shall contain information on all matters relating to the admission, legal status, care, and treatment of the patient and shall include all pertinent documents relating to the patient. The commissioner, by regulation, shall determine the scope and method of recording information, including data pertaining to admission, legal matters affecting the patient, records and notation of course of care and treatment, therapies, restrictions on patient's rights, periodic examinations, and such other information as he may require.

(b) The commissioner may require that statistical information about patients be reported to the department. Names of patients treated at out-patient or non-residential facilities and at general hospitals shall not be required as part of any such reports.

(c) Such information about patients reported to the department, including the identification of patients, and clinical records at department facilities shall not be a public record and shall not be released by the department or its facilities to any per-

son or agency outside of the department except as follows:

1. pursuant to an order of a court of record.

2. to the mental health information service.

3. to attorneys representing patients in proceedings in which the plaintiffs involuntary hospitalization is at issue.

4. with the consent of the commissioner and the consent of the patient or of someone authorized to act on the patient's behalf, to:

(i) physicians and providers of health, mental health, and social or welfare services involved in caring for, treating, or rehabilitating the patient, such information to be kept confidential and used solely for the benefit of the patient.

(ii) other persons who have obtained such consent.

5. with the consent of the commissioner, to:

(i) agencies requiring information necessary to make payments to or on behalf of patients pursuant to contract or in accordance with law, such information to be kept confidential and limited to the information required.

(ii) persons and agencies needing information to locate missing persons or to governmental agencies in connection with criminal investigations, such information to be limited to identifying data concerning hospitalization.

(iii) the firearms control board of the city of New York, when such board has requested information with regard to a named person, providing such request is accompanied by a certification from such board that the named person has applied to it for a permit or license pursuant to sections 436–6.3 and 436–6.6 of the administrative code of the city of New York.

(d) Nothing in this section shall prevent the exchange of information concerning patients, including identification, between (i) facilities providing services for such patients pursuant to an approved unified services plan, as defined in article eleven, or pursuant to agreement with the department and (ii) the department or any of its facilities. Information so exchanged shall be kept confidential and any limitations on the release of such information imposed on the party giving the information shall apply to the party receiving the information."

The silence of Section 15.13 as to whether mental patients themselves might be entitled to access to their medical files, should not be construed as a tacit legislative imprimatur. Quite the contrary, the statute establishes a general rule of nondisclosure and only permits access to a mental hospital's medical files in a limited number of enumerated situations. Where, as here, a statute makes specific exceptions to its general provisions, the general rule of construction *expressio unius personae est exclusio alterius* should be invoked and all exceptions not specifically stated in the statute should be excluded. *See, e. g.,* Herzberg v. Finch, 321 F.Supp. 1367 (S.D.N.Y.1971). The propriety of applying this rule of construction to this particular statute is amply supported by a number of New York cases which have been vigilant in restricting the right of access to a mental hospital's records to only those persons specifically listed in the statute. *See, e. g.,* Greff v. Havens, 186 Misc. 914, 66 N.Y.S.2d 124 (Sup.Ct. N.Y.Co.1946); Munzer v. State, 41 N. Y.S.2d 98 (Ct. of Claims 1943).

Similarly, the regulations and policy of the New York Department of Mental Hygiene recognize no right of a former patient to gain direct access to his medical records. Departmental policy, however, does permit a former patient to designate any licensed physician to receive the records for him. This procedure, on the one hand, allows a former patient to gain indirect access to his medical files and, on the other hand, it

also insures that a licensed medical practitioner will have an opportunity to review the hospital records before turning them over to the former patient. The rationale for not granting the patient direct access to this information is because:

(1) medical records ordinarily include information stated in technical medical terminology which might be misunderstood and misconstrued by an individual not medically trained;

(2) the revelation of some information in a former patient's record could be detrimental to that individual's current well being; and

(3) information, in an individual's medical record often includes references to other individuals, such as relatives, friends or fellow patients, which should remain confidential in order to protect the rights of those other individuals.

It is not material to the issues presented in this case for this court to pass upon the wisdom of such a policy. It is only necessary to note that such a policy does exist. It might, however, be relevant to note that New York is not the only state which permits access to medical records through a "screening mechanism." California, for instance, similarly denies a patient direct access to his medical records but permits him to authorize his attorney to examine and copy all or any part of the record without the necessity of filing suit. In a recent report, by a commission studying medical malpractice, it was observed that:

"[A] medical record in the hospital or the physician's office is far more than a series of entries reporting diagnoses, doctor's orders and actions taken pursuant to such orders. In the hospital setting the record is a complex of communications between health professionals, including a written history and physical progress notes, nurses' notes, consultations, lab reports, operation summary, discharge summary and the like. During the course of a particular hospitalization the record may include a wide spectrum of speculation and observation as the various members of the health team contribute thoughts and observations that lead eventually to the final diagnosis. If not properly explained, many of these entries could be exceedingly disturbing to a patient already apprehensive. However, to deter such entries could often eliminate the very clues that lead to successful diagnosis and treatment.

. . . Also the health teams use a wide variety of abbreviations and phrases that can be both confusing and unintelligible to the layman. For all of these reasons, the patient, though he is entitled to information about his health and his care, needs guidance in understanding and using it. For reasons such as these, many physicians are reluctant to give copies of their records to patients." DHEW, REP. OF SEC.'S COMMISSION ON MED. MALPRACTICE, at 76 (1973) (hereinafter "REPORT").[8]

■■■ Turning now to the case law of New York, it should be observed that few cases deal directly with access to a mental hospital's records and that most of the decisions in this state, as well as in other jurisdictions, involve the question of access to medical records generally. Although these latter cases should be examined, their application to the present action may be inappropriate since states have traditionally been more protective of the records of mental patients. *See* APP. TO REPORT at 181. Nevertheless, the state courts of New York have held that medical records are the property of the physician or the hospital and not the property of the

---

8. Statistically, the overwhelming majority of states do not permit a former patient access to his medical records either directly or indirectly, prior to the maintenance of a suit for malpractice. *See* DHEW, APPENDIX TO REP. OF SECRETARY'S COMM. ON MED. MALPRACTICE 181 (1973). (hereinafter "APP. TO REPORT.")

patient.[9]  As the court stated in In re Culbertson's Will, 57 Misc.2d 391, 292 N.Y.S.2d 806 (Surr. Ct. Erie Co. 1968):

> "This Court is satisfied, however, that records taken by a doctor in the examination and treatment of a patient become property belonging to the doctor. Generally speaking, an individual does not seek out a doctor for the purpose of obtaining records for his personal use, but seeks the personal services of his physician in the area of examination, diagnosis and treatment. The cost of x-rays, cardiograms, etc. and the reports thereof, although paid by the patient, are records supplied to the physician for his personal use in connection with the examination, diagnosis and treatment of the patient. The records and notes that accordingly come into the possession of the physician constitute a history of the case of benefit only to a physician as part of his clinical record concerning a particular patient." 292 N.Y.S.2d at 807–808.

In the *Culbertson* case a deceased physician had directed in his will that upon his death his executor should burn and destroy all of his medical files. Former patients of the doctor petitioned the court seeking an order (1) compelling the executor to deliver to them their medical records; or alternatively, (2) permitting them to examine and copy the relevant records. Although the court held that destroying the records would violate public policy, it still refused to grant either of the petitioners' requests for relief. Rather, the court ordered the executor to "make available the records and notes pertaining to the petitioners to the succeeding physician of the petitioners upon the authorized request of the petitioners." *Id.* at 810.

Implicit in the court's decision to deny the petitioners the relief requested was the court's determination that former patients do not have any claim of entitlement to their records.[10]  In reaching this determination, the court quoted at length from the Principles of Professional Conduct, which had been promulgated by the American Medical Association. One of the quoted Principles is excerpted here.

> "4.  Copy of physician's record to patient
>
> The Judicial Council does not believe that Chapter II, Section 3 (1955 edition of the Principles) intends or requires that a physician give a copy of his records to his patient. These records are primarily the physician's own notes compiled during the course of diagnosis and treatment so that he may review and study the course of the illness and his treatment. The records are medical and technical, personal and often informal. Standing alone they are meaningless to the patient but of value to the physician and perhaps to a succeeding physician. The patient, however, or one responsible for him, is entitled to know the nature of the illness and the general course or regimen of therapy employed by his physician. The extent to which the physician must advise his patient may be limited by the nature of the illness and the character of the patient. The physician in advising his patient must always act as he would wish to be treated were he in a like situation. (Judicial Council, 1956)." *Id.* at 809.

Granting a former patient access to medical records without resort to litigation is the exception rather than the rule in an overwhelming majority of our states. As of 1965 only six states had enacted special access laws, permitting a patient to examine and copy his medical records without resort to litigation. *See* APP. TO REPORT at 181. Once again

---

9.  This view would seem to be in accord with the approach adopted in the vast majority of states. *Id.*

10.  In their statistical survey of the various states, representatives of the Georgetown University Law Center found that few states recognized the interest of the patient in his hospital records. *Id.*

it should be emphasized that a mental patient's records are viewed in a more restrictive light than are the files of patients in general. Thus, in many of the states where special access laws are in effect, access to a mental hospital's records is specifically exempted.[11]

"Many of these access statutes state that their provisions are inapplicable to the records of mental patients whose records are governed by separate laws and regulations.

Many states are by statute explicitly protective of the confidentiality of the records of patients in state mental institutions. Usually the disclosure of their records is prohibited by law except (1) on the consent of the patient, (2) by consent of the hospital director as necessary for the treatment of the patient, (3) as a court may direct upon determination that disclosure is necessary for the conduct of proceedings before it and that failure to disclose would be contrary to the public interest, and (4) in hospitalization proceedings upon request of the patient's attorney (e. g. Kansas)." APP. TO REPORT at 181.

■ In sum, neither the statutory, administrative nor decisional law of New York recognizes a former patient's entitlement to his medical files in the absence of pending litigation. All of the New York cases upon which the plaintiffs rely are inapposite. For example, in Application of Weiss, 208 Misc. 1010, 147 N.Y.S.2d 455 (Sup.Ct.N.Y.Co.1955), the court held, in the context of a malpractice action, that a hospital may not withhold a patient's records to prevent him from discovering the identity of the physicians who treated him. This as well as the other cases cited by the plaintiffs come within an exception which holds that general medical records, held by a hospital, are "discoverable" when the patient has already commenced a personal injuries or malpractice action against the hospital.[12] This exception cannot and should not be extended to apply to the facts presented herein.

■ In light of the aforementioned discussion, this court concludes that the plaintiffs cannot show a sufficient property interest in the hospitals' medical records which would entitle them to constitutional protection under the Fourteenth Amendment.

CONCLUSION

Plaintiffs contend that this court is precluded from granting summary judgment herein because a great number of factual issues still exist. This court must disagree. There is no dispute as to the underlying facts of this case and all of the alleged controverted issues of fact conjured up by the plaintiffs are simply not material to the outcome of this case. Thus, this court finds that there exists here no genuine issue of fact to be tried and that the defendants are entitled to judgment as a matter of law. Even if this court resolved the purported issues of fact in the plaintiffs' favor, they still would not be entitled to relief. In so holding, this court need not reach the question of whether

11. Illustrative of a state where a distinction is drawn between general medical records and a mental patient's records is the state of Massachusetts. See Shikara v. Commissioner of Mental Health, 352 Mass. 779, 227 N.E.2d 477, cert. denied, 389 U.S. 899, 88 S. Ct. 227, 19 L.Ed.2d 223 (1967); Bane v. Superintendent of Boston State Hosp., 350 Mass. 637, 216 N.E.2d 111 (1967), cert. denied, 385 U.S. 842, 87 S.Ct. 96, 17 L.Ed.2d 75 (1967).

12. In some states this exception has been extended to require a hospital to permit a hospital insurance carrier, armed with the patient-policyholder's authorization, to inspect medical records so that the carrier might determine its liability to the insured. See Pyramid Life Ins. Co. v. Masonic Hosp. Ass'n, 191 F.Supp. 51 (W.D.Okl.1961); but see Pyramid Life Ins. Co. v. Gleason Hosp. Inc., 188 Kan. 95, 360 P.2d 858 (1961). It is interesting to note that the provisions of Section 15.13 of the Mental Hygiene Law permit insurance carriers to obtain the information which was sought in the Masonic Hospital case upon the Commissioner's approval.

the private hospitals acted under color of law, since even assuming *arguendo* that they did, their conduct did not deprive the plaintiffs of any right secured by the Constitution or the laws of the United States.

■ Since affidavits have been submitted in this case, the applications of the defendants Rabiner and Lipkowitz for dismissal of the action pursuant to Rule 12 of the Federal Rules of Civil Procedure should be construed by this court as motions for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.

Accordingly, it is

Ordered that the defendants' motions for summary judgment, granting judgment in their favor as a matter of law, be and the same are hereby granted.