PROJECT RELEASE, individually and on behalf of its members and all others similarly situated; Carrie Greene, individually and on behalf of all others similarly situated, Plaintiffs,

v.

James PREVOST, individually and as Commissioner of the New York State Department of Mental Hygiene and Office of Mental Health; Ronald Gottlieb, individually and as Director of the Mental Health Information Service for the First Judicial Department; Alfred Besunder, individually and as Director of the Mental Health Information Service of the Second Judicial Department; James Donnelly, individually and as Director of the Mental Health Information Service for the Third Judicial Department; Kevin Kearney, individually and as Director of the Mental Health Information Service for the Fourth Judicial Department; Nicholas Dubner, individually and as Acting Director of Creedmoor Psychiatric Center, Defendants.

No. 78 CV 1467 (ERN).

United States District Court,
E.D. New York.

Nov. 24, 1982.

Christopher A. Hansen, Robert Levy, New York Civil Liberties Union, New York City, for plaintiffs; Bruce J. Ennis, New York City, of counsel.

Robert Abrams, Atty. Gen., State of New York by Robert S. Hammer, Anne Marsha Tannenbaum, Asst. Attys. Gen., New York City, for defendants; New York State Office of Mental Health by Jeffrey J. Sherrin, and John Aveni, Albany, N.Y., of counsel.

Rogovin, Stern & Huge by Joel I. Klein, Vicki C. Jackson, Ellen S. Silberman, Washington, D.C., and Edward M. Chikofsky, New York City, for the American Psychiatric Association, as amicus curiae.

## MEMORANDUM OF DECISION AND ORDER

NEAHER, District Judge.

Project Release, a not-for-profit organization, and Carrie Greene, a State mental patient, brought this action to challenge the constitutionality of the voluntary, involuntary and emergency commitment procedures contained in New York Mental Hygiene Law (hereinafter "M.H.L.") §§ 9.13, 9.27, 9.39. Project Release is a self-help organization composed of current and former mental health patients, many of whom have been admitted to mental hospitals under M.H.L. Greene was admitted to a State mental hospital initially under the emergency procedure, M.H.L. § 9.39. She subsequently acceded to voluntary commitment, M.H.L. § 9.13, but was not permitted

to leave the hospital upon request. Instead, her commitment was converted to involuntary status pursuant to the procedures outlined in M.H.L. § 9.27. At a required hearing in New York State Supreme Court, Greene's involuntary commitment was reviewed and she was denied release.

Plaintiffs do not allege that defendants failed to comply with the statutory procedures, nor that the application of these procedures in their situations created a deprivation of a constitutional right. Rather, they assert broadly that the statutory scheme is facially unconstitutional because it fails to include certain criteria enumerated in their complaint. The resolution of the issues in this case turns on whether standards and procedures contained in the statute accord with constitutional requirements. As presented by these parties, the question is a legal and not a factual one, and can be determined on summary judgment. Rule 56, F.R.Civ.P.; *see Gotkin v. Miller,* 514 F.2d 125, 130 (2d Cir.1975).

*New York State Commitment Procedures*

■ M.H.L. provides a comprehensive system for the hospital admission of the mentally ill. A mentally ill person may enter a hospital voluntarily or informally, or may be brought into the hospital through involuntary or emergency procedures. Standards incorporated in the statute determine the applicable form of admission in an individual case, and the statute specifies procedural requirements and certain patient rights. Plaintiffs raise a broad challenge to New York's entire civil commitment system which can only be resolved upon a full analysis of the statutory scheme.

*Voluntary and Informal Admissions*

"[A]ny suitable person in need of care and treatment" may be admitted as a voluntarily committed mental patient upon that person's voluntary, written application. M.H.L. § 9.13. "[P]erson in need of care and treatment" is defined as someone who "has a mental illness for which in-patient care and treatment in a hospital is appropriate." M.H.L. § 9.01. To be found "suitable," a patient must be aware that he is applying to a mental hospital, and must understand the consequences of voluntary commitment; especially, the patient must comprehend the limitations governing release and the possibility that his status may be converted to involuntary commitment. M.H.L. § 9.17(a).

A voluntarily committed mental patient may give notice at any time of his desire to be discharged. Upon receipt of such notice, the patient must be promptly released unless the hospital director believes that the patient is in need of involuntary care. If the hospital director denies the patient release, the patient may be held for seventy-two hours for examination and evaluation. The patient then must be released unless the director has applied for a court order authorizing involuntary commitment. The patient, the Mental Health Information Service (MHIS), and certain designated persons must receive notice of this court application forthwith, and may demand a court hearing, to be held within three days of the demand. M.H.L. § 9.13. The requirements and procedures involved in any involuntary commitment then apply. *See* M.H.L. § 9.27, *discussed infra.*

If a patient remains hospitalized under the voluntary commitment procedures, MHIS must at least yearly review that patient's status to determine whether there is "any ground to doubt" the patient's suitability for voluntary treatment and willingness to be hospitalized. If any doubt exists, MHIS must, upon notice to the patient, apply for a court order to resolve that issue. A court hearing is available upon the request of MHIS, the patient, or a person acting on behalf of the patient. If MHIS finds that the patient is suitable and willing, it must file a certification of its conclusions in the patient's record. M.H.L. § 9.25.

A person may also seek admission to a mental hospital as an *informal patient.* The standards for acceptance for informal admission are the same as the standards for voluntary admission. *See* M.H.L. §§ 9.01, 9.17. An informal patient, however, need not submit a written application, and may leave at any time. M.H.L. § 9.15.

## Involuntary Admission

A person "alleged to be mentally ill and in need of involuntary care and treatment" may be a candidate for involuntary commitment. M.H.L. § 9.27(a). Someone "in need of involuntary care and treatment" is a person who "has a mental illness for which care and treatment in a hospital is essential to such person's welfare and whose judgment is so impaired that he is unable to understand the need for such care and treatment." M.H.L. § 9.01.

An involuntary commitment pursuant to M.H.L. § 9.27 must be supported by two certificates from examining physicians and an application setting forth facts demonstrating the existence of a mental illness and the need for involuntary care and treatment. M.H.L. § 9.27. When a person is brought to a hospital for involuntary commitment, he must be examined forthwith by a third physician who is on the hospital's psychiatric staff. If this physician also certifies the need for involuntary commitment, the patient may be admitted. M.H.L. § 9.27(e). The examining physicians are under a duty, however, to "consider alternative forms of care and treatment that might be adequate to provide for the person's needs without requiring involuntary hospitalization." M.H.L. § 9.27(d).

An involuntary commitment may also result if a director of community services or his designated physician certifies that an individual "has an illness for which immediate care and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or others." M.H.L. § 9.37(a). "Likelihood to result in serious harm" exists if the patient presents:

"(1) substantial risk of physical harm to himself as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that he is dangerous to himself, or

"(2) a substantial risk of physical harm to others as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm." *Id.*

The patient must be examined by a staff physician prior to admission, and the need for hospitalization must be confirmed. A second examination by a member of the hospital's psychiatric staff must occur within seventy-two hours of admission.

MHIS must receive immediate notice of a patient's involuntary commitment, M.H.L. § 9.29(a), and must inform the patient of his statutory rights. M.H.L. § 29.09(b)(2). Additionally, written notice of the admission and the patient's rights must be given within five days to the patient's next of kin who was not a commitment applicant, and to as many as three persons that the patient may designate in writing.

An involuntarily committed patient may be held without court authorization for sixty days. *See* M.H.L. § 9.33(a). The patient, however, has a right to a hearing, which may be requested at any time by the patient, a friend or relative, or MHIS. The court must conduct a hearing within five days of receipt of the request, and may hear testimony and examine the patient to determine the need for involuntary care and treatment. The court may order immediate release. M.H.L. § 9.31.

Unless the mental hospital director obtains court authorization for continued retention, an involuntarily committed mental patient must be released at the later of sixty days from admission or thirty days from a court denial of a request for release. The patient, as many as three persons designated by the patient, and MHIS must receive written notice of an application for this court authorization, and any of these parties may request a hearing. If requested, the hearing must be held within five days. The initial court order may authorize retention for six months; subsequent court orders are required to retain the patient for one and then two years. M.H.L. § 9.33.

A patient denied release by a court pursuant to § 9.31 or retained by court authorization pursuant to § 9.33 may obtain review by a trial court. The trial will be held before a jury unless the patient waives the jury right. M.H.L. § 9.35.

*Emergency Admissions*

A person "alleged to have a mental illness for which immediate observation, care and treatment in a hospital is appropriate and which is likely to result in serious harm to himself and others" may be involuntarily committed and retained in a mental hospital for fifteen days. M.H.L. § 9.39(a). A patient brought to the hospital for emergency admission must be examined immediately by a staff physician, and must be examined again within forty-eight hours by a member of the hospital's psychiatric staff. M.H.L. § 9.39(a).

The patient and as many as three persons designated by the patient must be given notice of the patient's status and rights upon admission. MHIS must also be notified. The patient, a relative, friend, or MHIS may request a court hearing, which must be held within five days of any request, to determine whether reasonable cause exists to continue the patient's emergency commitment. *Id.*

Fifteen days after admission, the patient must be released unless the patient agrees to voluntary or informal status under M.H.L. § 9.13 or § 9.15, or unless the patient is involuntarily committed pursuant to the full proceedings contained in M.H.L. § 9.31.

*Patient Rights*

Every mental patient has a statutory right to "care and treatment that is suited to his needs and skillfully, safely, and humanely administered with full respect for his dignity and personal integrity." M.H.L. § 33.03(a). A written treatment plan must be developed for each patient, and that patient or an authorized representative must be interviewed and allowed to participate in its preparation. M.H.L. § 29.13. Additionally, a mental patient is entitled to "careful reexamination and reevaluation" at least yearly, including annual professional mental, medical and dental examinations. M.H.L. § 33.03(b)(1) & (2). No treatment or therapy may be given without an order by a staff member based upon appropriate examination. M.H.L. § 33.03(b)(3).

Informal and voluntary patients may not be treated without consent unless "treatment appears necessary to avoid serious harm to life and limb of the patients themselves." 14 N.Y.C.R.R. § 27.8(a) & (b). An involuntary patient who objects to non-emergency treatment may be treated only after the head of a service reviews the proposed treatment and the patient's objections. The patient also has a right of appeal to the facility director concerning any care and treatment decision, and a right to counsel for this appeal. 14 N.Y.C.R.R. § 27.8(d) & (e)(1). Any decision of a facility director may be appealed to the regional director, and must be reviewed within five days. 14 N.Y.C.R.R. § 27.8(e)(3). MHIS must receive notice at each step. 14 N.Y.C.R.R. § 27.8(c)(d) & (e). No treatment opposed on religious grounds is permitted without a court order. 14 N.Y.C.R.R. § 27.8(b)(3)(ii). No surgery, shock treatment, or experimental practices may be administered without consent, and refusal to consent may not be challenged. M.H.L. § 33.03(b)(4). Any use of physical restraints is subject to strict regulation. M.H.L. § 33.04.

The statutorily-created MHIS further protects patient rights. Its duties include: reviewing the admission and retention of all patients; informing patients and other interested parties of the "procedures for admission and retention and of patients' rights to have judicial hearing and review, to be represented by counsel, and to seek independent medical opinion"; providing the court with all relevant information, such as the patient's records and rights, and any need for appointed counsel; investigating and litigating cases of alleged patient mistreatment or abuse; and examining grievance and disciplinary procedure results to make reports and recommendations to the State legislature. M.H.L. § 29.09(b); *see* §§ 9.25(a), 9.29, 9.31(a), 9.39.

*Plaintiffs' Claims*

Plaintiffs allege that New York State's voluntary, involuntary, and emergency commitment procedures are overbroad in violation of a fourteenth amendment sub-

stantive due process right because they fail to require:

"(a) The person has a serious mental disorder, and

"(b) The person's disorder is susceptible to treatment by existing medical or psychological techniques, and

"(c) Adequate personnel and other resources exist at the proposed facility to provide such treatment as will afford the person with a realistic opportunity to be cured or to improve, and

"(d) The person presents a substantial and present risk of serious physical harm to himself or others, and

"(e) The person has recently committed an act which caused or reasonably should have caused serious physical harm to himself or others, and

"(f) The person cannot receive the necessary help in any less restrictive setting." (Complaint, p. 6.)

Plaintiffs further assert that their civil commitments did not comport with certain procedures they believe to be constitutionally required. Specifically, plaintiffs argue that procedural due process mandates: (a) a probable cause hearing within forty-eight hours of admission; (b) automatic judicial review within five days; (c) adequate counsel; (d) adequate notice, including access to hospital records; (e) the right to remain silent and notice of that right; and (f) the right to refuse treatment prior to a commitment hearing. Finally, the plaintiffs claim

that the statute is unconstitutionally vague.[1]

Plaintiffs moved initially for partial summary judgment on all the issues raised in the complaint except the challenges to the voluntary commitment procedures and the adequacy of counsel.[2] Defendants argued in opposition that an examination of the substantive criteria and procedural requirements of all three forms of civil commitment demonstrates sufficient due process protections and dispels any argument that the statute is vague or overbroad. Defendants thus requested that the Court declare the entire statutory scheme to be constitutional; plaintiffs did not challenge this request, but instead rebutted defendants' legal arguments. Therefore, the Court now considers this motion as one for summary judgment on all issues raised in the pleadings.

*Substantive Due Process Claims*

The constitutionality of the language of M.H.L. defining mental illness, which contemplates civil commitment only upon a showing that the person suffers from a substantial mental illness, is not seriously in dispute. *See* M.H.L. §§ 9.01, 9.13, 9.27, 9.39. The five remaining substantive due process criteria contained in plaintiffs' proposal in essence present a two-pronged attack on the New York commitment standards. First, plaintiffs would have the Court hold that proof of imminent danger, demonstrated by a recent overt act, must

---

1. Implicit in this Court's discussion of New York's commitment standards and procedures is a finding that the statute is not unconstitutionally vague.

2. Plaintiffs' original complaint asserted that their commitments under M.H.L. were unconstitutional in part because

"[t]hey were ... not provided with adequate counsel (specifically, the Mental Health Information Service does not provide adequate counsel in part because in most of the state it is required to provide service as counsel to patients and as independent investigator for the court by § 29.09(b))."

In plaintiffs' motion for partial summary judgment, they specifically did not move on the right to counsel issue. However, in their supporting memoranda, plaintiffs did address this issue, stating that the right to have MHIS

present as counsel at discussions between a patient and hospital staff was guaranteed by M.H.L. § 29.09. This counsel right already exceeds constitutional prescriptions. *Lynch v. Baxley,* 386 F.Supp. 378, 389 n. 5 (M.D.Ala. 1974); *see Lessard v. Schmidt,* 349 F.Supp. 1078, 1100 (E.D.Wis.1972). As defendants note, by statute, involuntarily committed individuals also have the right to have counsel present at court hearings, and indigent patients may have counsel appointed. N.Y.Jud.Law § 35(1)(a).

In light of the foregoing, this Court views the right to counsel prong of plaintiffs' proposed procedural criteria as a nonissue in this case. Certainly, an argument that New York's civil commitment statute is unconstitutional on its face cannot be supported on this ground.

support any civil commitment. Once demonstrable dangerousness is shown, plaintiffs would further require that a treatability standard, based on whether the patient's illness is treatable, whether the State facilities are capable of treating, and whether any less restrictive method of treatment is available, be met before any patient could be civilly committed.

*Imminent Dangerousness and an Overt Act*

■ The State violates the due process clause when it commits without treatment a nondangerous individual who could survive safely in freedom. *O'Connor v. Donaldson,* 422 U.S. 563, 576, 95 S.Ct. 2486, 2494, 45 L.Ed.2d 396 (1975). Furthermore, even when the State provides treatment, due process may not tolerate the involuntary commitment of a nondangerous individual. *See, e.g., Suzuki v. Yuen,* 617 F.2d 173 (9th Cir.1980); *Lessard v. Schmidt,* 349 F.Supp. 1073 (E.D.Wis.1972), *vacated on other grounds,* 414 U.S. 473, 94 S.Ct. 713, 38 L.Ed.2d 661 (1973), *on remand,* 379 F.Supp. 1376 (E.D.Wis.1974), *vacated on other grounds,* 421 U.S. 957, 95 S.Ct. 1943, 44 L.Ed.2d 445 (1975), *on remand,* 413 F.Supp. 1318 (E.D.Wis.1976); *cf. Humphrey v. Cady,* 405 U.S. 504, 509, 92 S.Ct. 1048, 1052, 31 L.Ed.2d 394 (1972). The New York involuntary commitment procedures, however, do not operate to permit the confinement of the nondangerous mentally ill.[3] *See Lessard,* 349 F.Supp. at 1093 (upholding Wisconsin statute because court found dangerousness requirement implicit in statute).

A person who could not safely survive without the care and assistance provided in a hospital poses a clear danger to himself. *O'Connor,* 422 U.S. at 573 n. 9, 95 S.Ct. at 2493 n. 9 ("a person is literally 'dangerous to himself' if for physical reasons he is helpless to avoid the hazards of freedom"). Section 9.27 directs the involuntary hospitalization of only those individuals who could not sustain themselves without such care and treatment. Several safeguards contained within the statute assure this result.

An individual may be involuntarily committed only if "care and treatment in a *hospital* is *essential* to such person's welfare." M.H.L. § 9.01 (emphasis added). In determining that this standard is met, the examining physicians are under a duty to consider whether alternatives less restrictive than hospitalization are available. M.H.L. § 9.27(d). Furthermore, involuntary commitment may occur only when three physicians certify that the patient's "judgment is so impaired that he is unable to understand the need for such care and treatment." M.H.L. §§ 9.01, 9.27. An individual who, although mentally ill, is still capable of a rational decision to refuse hospitalization may not be involuntarily committed under the New York statute. *See Lessard,* 349 F.Supp. at 1094.

A patient whose mental illness presents an affirmative danger "likely to result in serious harm to himself or others" may be confined under involuntary or emergency procedures. M.H.L. §§ 9.37, 9.39. Although plaintiffs assert that due process mandates a more stringent standard, the definition of "likelihood of serious harm" contained in these provisions has been held

---

3. Although the New York Court of Appeals in *Fhagen v. Miller,* 29 N.Y.2d 348, 353, 328 N.Y. S.2d 393, 278 N.E.2d 615, *cert. denied,* 409 U.S. 845, 93 S.Ct. 47, 34 L.Ed.2d 85 (1972), appears to indicate that the commitment procedures then in effect permitted confinement of nondangerous mental patients, New York has since revised its mental hygiene law. The New York courts do not currently view *Fhagen* as controlling; rather, as one court stated:

"Substantive due process requires that the continued confinement of an individual must be based upon a finding that the person to be committed poses a real and present threat of substantial harm to himself or others.... Such criteria would authorize the continued confinement of an individual whose mental illness manifests itself in neglect or refusal to care for himself where such neglect or refusal presents a threat of substantial harm to his own well-being.... What due process does proscribe, in our view, is the continued involuntary commitment of a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and able family members."
*Scopes v. Shah,* 398 N.Y.S.2d 911, 913, 59 A.D.2d 203 (3d Dept. 1977) (citations omitted).

constitutional. *Scopes v. Shah,* 398 N.Y. S.2d 911, 913, 59 A.D.2d 203 (3d Dept. 1977).

More specifically, proof of a recent overt act need not be added to the New York commitment standard. Confinement of the mentally ill must adhere to substantive and procedural standards designed to minimize the risk of erroneous confinement. *See Addington v. Texas,* 441 U.S. 418, 426, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323 (1979). An overt act requirement, however, would in essence result in superimposing criminal concepts into the civil commitment proceedings. In *Addington,* the Supreme Court noted the differences in purpose and effect between civil commitment and criminal conviction:

> "[T]he initial inquiry in a civil commitment proceeding is very different from the central issue in either a delinquency proceeding or a criminal prosecution. In the latter cases the basic issue is a straightforward factual question—did the accused commit the act alleged? There may be factual issues to resolve in a commitment proceeding, but the factual aspects represent only the beginning of the inquiry. Whether the individual is mentally ill and dangerous to either himself or others and is in need of confined therapy turns on the *meaning* of the facts which must be interpreted by expert psychiatrists and psychologists." *Id.* at 429, 99 S.Ct. at 1811 (emphasis in original).

Plaintiffs argue that psychiatric standards cannot predict dangerousness with sufficient accuracy to justify the liberty deprivations inherent in civil commitment. Sections 9.37(a) and 9.39(a) do not rely solely on medical diagnosis, but instead require that the potential for serious harm be objectively "manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that [the patient] is a danger to himself ... [or] by homicidal or other violent behavior." To adopt plaintiffs' standard requiring proof of a recent act "which caused or reasonably should have caused serious physical harm to himself or others" would be to exceed what due process requires.

The New York statute is not facially unconstitutional simply because it fails to require that an overt act be shown in support of every civil commitment. An act indicative of dangerousness may, in a given case, be central to a medical expert's diagnosis or a factfinder's conclusion; conversely, the absence of an overt act may, in a particular situation, support an individual's challenge to his confinement as improper. *See United States ex rel. Mathew v. Nelson,* 461 F.Supp. 707, 711 (N.D.Ill.1978). Regardless, an impartial factfinder, guided by medical documentation, should be permitted to determine that mental illness is present and danger likely without waiting for an individual's conduct to make serious physical harm all but inevitable. *See, e.g., Warren v. Harvey,* 632 F.2d 925, 936 (2d Cir.), *cert. denied,* 449 U.S. 902, 101 S.Ct. 273, 66 L.Ed.2d 133 (1980); *but see Lessard,* 349 F.Supp. at 1093.

*Treatability*

M.H.L. creates a statutory right to treatment, and specifies duties imposed on hospital personnel to assure that no patient is deprived of that treatment. M.H.L. § 33.-03(a); *see Woe v. Mathews,* 408 F.Supp. 419, 426–28 (E.D.N.Y.1976), *aff'd sub nom. Woe v. Weinberger,* 562 F.2d 40 (2d Cir.), *cert. denied,* 434 U.S. 1048, 98 S.Ct. 895, 54 L.Ed.2d 799 (1977). An individual will be found "suitable" for voluntary admission only if "in-patient care and treatment in a hospital is appropriate." M.H.L. §§ 9.01, 9.13. As noted, hospitalized care and treatment must be "essential" before involuntary commitment is permitted. M.H.L. §§ 9.01, 9.27. All patients are entitled to individualized written treatment plans, M.H.L. § 29.13, and to at least annual review. *See* M.H.L. §§ 29.09(b), 33.03; *see, also, In re Tornsey,* 47 N.Y.2d 667, 420 N.Y.S.2d 192, 394 N.E.2d 262 (1979) (propensity for dangerousness not sufficient to support civil commitment; mental illness must be present).

Despite these provisions, plaintiffs argue that the confinement of a mentally ill individual is unconstitutional unless the individual's mental illness is treatable. Whether

mere custodial confinement is constitutional is not an issue that must be resolved in this case.[4] *See Youngberg v. Romeo,* —— U.S. ——, ——, 102 S.Ct. 2452, 2463, 73 L.Ed.2d 28 (1982) (Blackmun, J., concurring); *id.* at 2465 (Burger, C.J., concurring). New York does not purport to provide only custodial care; the statute mandates individually-tailored treatment programs. Although medical science may not guarantee a cure and known treatment methods may not assure eventual improvement or freedom, the State may still constitutionally confine for "care and treatment" dangerous mentally ill patients. The New York commitment statute requires, first, that the appropriateness of hospitalized care be considered before any commitment decision be made, and, second, that the patient be afforded individualized treatment for the duration of his confinement. Due process does not require more.

Plaintiffs' remaining proposals for a treatability standard are similarly without merit. M.H.L.'s provision for individualized treatment programs constitutes a statutory guarantee that a patient will be afforded, as the plaintiffs request, a "realistic opportunity to be cured or to improve." *See Renelli v. Department of Mental Hygiene,* 340 N.Y.S.2d 498, 73 Misc.2d 261 (Sup.Ct. 1973). Consideration of whether the patient's needs can be met in "any less restrictive setting," the last of plaintiffs' substantive due process challenges, is already required by the New York statute. M.H.L. § 9.27(d); *see Kesselbrenner v. Anonymous,*

33 N.Y.2d 161, 350 N.Y.S.2d 889, 305 N.E.2d 903 (App.1973).

■ Plaintiffs have only attacked the New York statute as written. If the State fails to meet either its statutory or its constitutional duty to care for and treat the involuntarily committed, the patient has available redress through an Article 78 proceeding, CPLR §§ 7801–04; *see Renelli,* 340 N.Y.S.2d 498, 73 Misc.2d 261, or through a habeas corpus proceeding. M.H.L. § 15.15. *See Woe,* 408 F.Supp. at 427. The statute's failure to comply with plaintiffs' six-part criteria does not, however, invalidate the statute on substantive due process grounds.

*Procedural Due Process Claims*

*Time Provisions*

Plaintiffs' first and second procedural claims address the patient's right to an adversarial hearing within a reasonable amount of time to determine the appropriateness of his commitment. The New York statute, plaintiffs argue, is rendered unconstitutional by its failure to require a probable cause hearing to be held within forty-eight hours of admission and to provide for automatic judicial review within five days.

A hearing must be made available to an involuntarily committed patient within a reasonable time after confinement. Due process issues, however, should not be resolved "in terms of required days, hours, or minutes, but should rather turn on the basis of the interests involved and fundamental fairness." *French v. Blackburn,* 428

---

**4.** Mental illness alone will never justify custodial confinement:

"May the State confine the mentally ill merely to ensure them a living standard superior to that they enjoy in the private community? That the State has a proper interest in providing care and assistance to the unfortunate goes without saying. But the mere presence of mental illness does not disqualify a person from preferring his home to the comforts of an institution. Moreover, while the State may arguably confine a person to save him from harm, incarceration is rarely if ever a necessary condition for raising the living standards of those capable of surviving safely in freedom, on their own or with the help of family or friends. . . .

"May the State fence in the harmless mentally ill solely to save its citizens from exposure to those whose ways are different? One might ask if the State, to avoid public unease, could incarcerate all those who are physically unattractive or socially eccentric. Mere public intolerance or animosity cannot constitutionally justify the deprivation of a person's physical liberty. . . .

"In short, a State cannot constitutionally confine without more a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends."

*O'Connor,* 422 U.S. at 575–76, 95 S.Ct. at 2493–94 (citations omitted).

F.Supp. 1351, 1355 (M.D.N.C.1977), *aff'd per curiam,* 443 U.S. 901, 99 S.Ct. 3091, 61 L.Ed.2d 869 (1979). New York's procedures are not unconstitutional merely because they do not meet plaintiffs' proposed time requirements.[5]

M.H.L. sets a sixty-day limit on involuntary confinement without judicial review, and a fifteen-day limit on emergency retention. Although due process "does not deal in magic numbers," *French,* 428 F.Supp. at 1355, the New York provision may be at the outer edge of a constitutionally permissible length of time. *See, e.g., Logan v. Arafeh,* 346 F.Supp. 1265 (D.Conn.1972) (forty-five days), *aff'd sub nom. Briggs v. Arafeh,* 411 U.S. 911, 93 S.Ct. 1556, 36 L.Ed.2d 304 (1973). However, M.H.L. includes numerous other provisions which assure that the involuntarily committed are afforded repeated opportunities for review and release and, therefore, the statute complies with the due process "fundamental fairness" standard. *See, e.g., French,* 428 F.Supp. at 1355; *Logan,* 346 F.Supp. at 1271.

Generally, two certificates from examining physicians, plus an examination by a staff physician, must all concur in the need for hospitalization before an involuntary admission may occur. An examination by a psychiatrist is required within seventy-two hours. Thus, any of four medical experts may defeat commitment attempts by determining that hospitalization is not essential or that a less restrictive alternative is available. Even in an emergency, at least one physician and one psychiatrist may disapprove the confinement.

MHIS is under a statutory duty to review all commitments. The patient, MHIS, the patient's next of kin, and as many as three persons designated by the patient must be given notice of the confinement and of the patient's rights. Any of the parties receiving notice may demand a judicial hearing, which must be provided within five days. If none of these parties believes that court review is necessary, the patient still must be released in sixty days unless the State obtains court authorization.

M.H.L. contains stringent requirements concerning who may be made subject to commitment, provides for multiple levels of medical review, imposes a duty of review on a State agency, and invites the involvement of the patient, his family and friends. *See French,* 428 F.Supp. at 1355; *Logan,* 346 F.Supp. at 1271. All these safeguards certainly do not substitute for an individual's due process right to have an impartial factfinder determine the propriety of his confinement. Due process does not, however, require that the focus of State energies and moneys be shifted from the evaluation and treatment of the mentally ill to strict compliance with detailed procedural requirements. *See Parham v. J.R.,* 442 U.S. 584, 605–06, 99 S.Ct. 2493, 2505–06, 61 L.Ed.2d 101 (1979); *French,* 428 F.Supp. at 1355.

The five-day lapse between a hearing demand and the hearing itself, the fifteen-day limit on emergency confinement, and the sixty-day limit on involuntary confinement are constitutional because M.H.L. contains provisions that otherwise demonstrate an adherence to a right to treatment and to procedural safeguards. These time provisions are part of a statutory scheme which, taken as a whole, renders them fundamentally fair in accordance with due process.

*Notice—Access to Hospital Records*

Plaintiffs argue that patients are entitled to a statement of the specific facts which led to their confinement. They further assert that the most complete statement is usually contained in hospital records, and therefore due process notice requirements mandate service of these records.

When the State seeks court authorization for continued involuntary retention, M.H.L. § 9.33(a) requires that "[t]he director shall

---

5. Several opinions have held that due process mandates specific time limits. *See, e.g., Lessard,* 349 F.Supp. at 1083 (probable cause hearing within forty-eight hours; final judicial hearing in five days). This Court finds the more recent opinions in *French* and *Logan* to be more persuasive and, in light of the U.S. Supreme Court's summary affirmances, binding authority.

cause written notice of such application to be given the patient." Addressing a similar statutory provision, the court in *French,* 428 F.Supp. at 1356, declared:

> "The statute ... uses the terms 'notify' and 'notice'. There can be little doubt that these terms were used to carry the full panoply of due process notice mandated by the law of the land. We hold that when the legislature used the term 'notice' it means that notice as is required by due process and, therefore, conclude that the statute is constitutional on its face."

No reason is given to find that when the New York statute says "notice," it does not also mean notice in accordance with the due process clause.

Specifically, plaintiffs incorrectly assert that the State must provide patients with copies of their hospital records. Due process does not require such disclosure, and public policy cautions against it.

Significant harm could result from allowing a mentally ill individual access to medical records which may, for example, contain technical medical evaluations or potentially disturbing statements from family members. *See Parham,* 442 U.S. at 605, 99 S.Ct. at 2505; *Gotkin v. Miller,* 379 F.Supp. 859, 866 (E.D.N.Y.1974), *aff'd,* 514 F.2d 125 (2d Cir.1975); *French,* 428 F.Supp. at 1357 n. 10. Concededly, a finding by a reviewing court that an involuntarily committed mental patient's confinement is invalid eviscerates much of the concern with the sensitive nature of the patient's medical records. A broad requirement, however, that all mental patients be given their medical files before a court determination would frequently thwart the State's treatment goals.

The notice to a given patient may be constitutionally insufficient in some circumstances but, again, the gravamen of plaintiffs' complaint is whether the New York commitment procedures, in and of themselves, assure due process. The notice provisions do.

### Privilege Against Self-Incrimination

[5] Plaintiffs assert that involuntarily committed mental patients have a right to remain silent, particularly in psychiatric examinations, and a right to be informed that what they say may be admissible in subsequent commitment proceedings. Civil commitment indisputedly entails a substantial curtailment of liberty. However, a deprivation of liberty, without more, does not invoke the fifth amendment privilege. *French,* 428 F.Supp. at 1358.

Psychiatric examinations are not the equivalent of criminal interrogations. Their primary purpose is diagnosis and the development of treatment goals, not the marshalling of "incriminating" evidence. A patient's statements are not admitted "against" him at a commitment hearing. To the contrary, the sole intent of a commitment proceeding is to ascertain the patient's needs. Instructing a patient that he may remain silent is not constitutionally mandated, and in fact would needlessly undermine valid mental health objectives. *Id.* at 1358–59; *cf. Suzuki,* 617 F.2d at 176–78 (holding that fifth amendment is inapplicable but questioning whether involuntary commitment can be supported by silence alone).

### Right to Refuse Treatment

Plaintiffs object to all nonemergency, forcible treatment of an involuntarily committed patient prior to a judicial review of the commitment. Plaintiffs argue that a patient who has been medicated without consent cannot effectively participate in a commitment hearing.

■ Although plaintiffs have based their argument on a procedural due process ground, the issue is more complex. Whether an involuntarily committed mental patient has a constitutional right to refuse treatment in any circumstance is an unresolved issue which implicates both substantive and procedural due process rights. *Mills v. Rogers,* —— U.S. ——, 102 S.Ct. 2442, 2448, 73 L.Ed.2d 16 (1982). The first question to be resolved by this Court, however, is whether State law already creates substantive and procedural rights which exceed the minimum due process protections arising from the fourteenth amendment.

When State law "recognize[s] liberty interests more extensive than those independently protected by the Federal Constitution," and "confer[s] procedural protections of liberty interests that extend beyond those minimally required by the Constitution," then "the minimal requirements of the Federal Constitution would not be controlling, and would not need to be identified in order to determine the legal rights and duties of persons within the State." *Id.* at 2449, *vacating and remanding,* 634 F.2d 650 (1st Cir.1981) (Court of Appeals had relied on State and federal grounds to find the existence of a right to refuse treatment and to establish procedural protections); *see Rennie v. Klein,* —— U.S. ——, 102 S.Ct. 3506, 73 L.Ed.2d 1381 (1982), *vacating and remanding,* 653 F.2d 836 (3rd Cir.1980) (to be reconsidered in light of *Youngberg v. Romeo* ).

The Supreme Court in *Youngberg* addressed the independent fourteenth amendment liberty interest of an involuntarily committed mentally retarded individual. The Court held that the patient had constitutionally guaranteed liberty interests in safe conditions and freedom from bodily restraint, and in "minimally adequate training" to ensure these interests. *Id.* 102 S.Ct. at 2458–60. Forcible medication can alter mental processes and limit physical movement, and therefore is analogous to bodily restraint.

■ Unquestionably, every patient has an interest in the judicial review of his confinement; some medical treatment, however, may be necessary to ensure that the patient is even capable of effective participation. Moreover, a mentally ill patient's liberty interest in freedom from bodily restraint and in safety may conflict with his liberty interest in freedom from nonconsensual medication. *See Youngberg,* 102 S.Ct. at 2460; *Addington,* 441 U.S. at 429, 99 S.Ct. at 1811. Although the patient who has not had his commitment judicially authorized may ultimately be found to be invalidly confined and not truly in need of treatment, a patient committed on an involuntary or emergency basis is, in the opinion of two or more doctors, in need of hospitalized treatment. The State has an interest in immediately pursuing its treatment goals—an interest shared, at least in part, by most patients. Legitimate State interests, including the patient's treatment needs and the safe and orderly operation of the institution, support a finding that the right to refuse treatment is not absolute. The issue, then, is whether New York's regulations are adequate to balance these competing interests and to ensure due process. *See Youngberg,* 102 S.Ct. at 2452 ("In determining whether a substantive right protected by the Due Process Clause has been violated, it is necessary to balance 'the liberty of the individual' and 'the demands of an organized society' ").

Although the due process clause protects a minimum liberty interest in freedom from forcible medication, this Court need not define its parameters. *See Mills, supra.* State regulation provides for a right to object to treatment, 14 N.Y.C.C.R. § 27.1, 27.8(b)(3) & (c), and that right already encompasses any substantive due process right that might exist. The State regulations also establish constitutionally sufficient procedures. The State provides involuntarily committed mental patients with a substantive right to object to treatment. By State regulation, no objectionable nonemergency treatment may be administered prior to review by a neutral medical factfinder, with possible appeal. Counsel may be present to ensure the representation of a patient's interests.

■ Due process does not necessitate a full adversarial hearing before a legally-trained factfinder in every situation; in determining the rights of the mentally ill, review by an independent medical expert may be sufficient. *Parham,* 442 U.S. at 607, 99 S.Ct. at 2506; *see Youngberg,* 102 S.Ct. at 2462 ("courts must show deference to the judgment exercised by qualified professionals"). Without determining precisely what minimum procedural rights arise independently from the due process clause, this Court holds that due process requires no more than New York provides.

**1310**

*Voluntary Commitment*

In their complaint, plaintiffs asserted the same substantive and procedural failings in their attack on the constitutionality of the voluntary commitment statute as in their challenge to the involuntary and emergency proceedings. This Court has found no constitutional defect in New York's emergency and involuntary standards, and no basis to require M.H.L. §§ 9.27 & 9.39 to conform to plaintiffs' proposed criteria. For the same reasons, this Court holds that New York's voluntary commitment statute, M.H.L. § 9.13, is in compliance with substantive and procedural due process.

A dedication to patient rights permeates the New York voluntary commitment statute. The patient must be given notice of his rights, and must understand the statutory restrictions created by his status. MHIS must regularly review the patient's status, and must seek release of any patient who no longer needs treatment or who is unwilling to remain on a voluntary basis. Conversion to involuntary status triggers all the procedural safeguards in any involuntary commitment proceeding.

The State has a legitimate interest in "not imposing unnecessary procedural obstacles that may discourage the mentally ill or their families from seeking needed psychiatric assistance." *Parham,* 442 U.S. at 606, 99 S.Ct. at 2506. Nevertheless, plaintiffs essentially argue for the abolition of voluntary commitment. They assert that the State coerces "voluntary" admissions. If the State is not in compliance with its own statutory provisions, despite their facial validity, the solution is not to strike down the statute, but to seek its correct enforcement.

For the foregoing reasons, this Court holds that New York's voluntary, involuntary, and emergency commitment procedures are facially constitutional, satisfying both substantive and procedural due process requirements. The Court grants summary judgment for the defendants on all substantive issues raised in the pleadings; therefore, the Court need not resolve the class certification issue.

SO ORDERED.