PROJECT RELEASE, Carrie Greene, et al., Plaintiffs-Appellants,

v.

James PREVOST, individually and as Commissioner of the New York State Department of Mental Hygiene and Office of Mental Health; Ronald Gottlieb, individually and as Director of the Mental Health Information Service for the First Judicial Department; Alfred Besunder, individually and as Director of the Mental Health Information Service of the Second Judicial Department; James Donnelly, individually and as Director of the Mental Health Information Service for the Third Judicial Department; Kevin Kearney, individually and as Director of the Mental Health Information Service for the Fourth Judicial Department; Nicholas Dubner, individually and as Acting Director of Creedmoor Psychiatric Center, Defendants-Appellees.

No. 1310, Docket 82–7943.

United States Court of Appeals, Second Circuit.

Argued May 13, 1983.

Decided Oct. 24, 1983.

---

4. *Cf.* section 10(j) with section 10(*l*), which later requires the Board to drop all else.

Robert M. Levy, New York City (New York Civil Liberties Union, Diana T. Tanaka, Christopher A. Hansen, New York City, of counsel), for plaintiffs-appellants.

Caren S. Brutten, Asst. Atty. Gen., New York City (Robert Abrams, Atty. Gen., of N.Y., Melvyn R. Leventhal, John P. Petrila, Seth Abrams, New York State Office of Mental Health, New York City, of counsel) for defendants-appellees.

Joel I. Klein, H. Bartow Farr, III, Stephen I. Glover, Onek, Klein & Farr, Washington, D.C. for The American Psychiatric Ass'n, as amicus curiae.

Before OAKES, CARDAMONE and PIERCE, Circuit Judges.

PIERCE, Circuit Judge:

This appeal requires us to determine whether standards and procedures for voluntary, involuntary and emergency civil commitment embodied in the New York State Mental Hygiene Law (M.H.L.) sections 9.13, 9.27, 9.37 and 9.39 (McKinney 1978),[1] meet federal constitutional due process minima. Appellants appeal from a ruling of the United States District Court for the Eastern District of New York, Edward R. Neaher, *Judge,* construing appellants' complaint as a facial challenge to the provisions in question, finding the challenged provisions constitutional on their face and granting summary judgment in favor of appellees as to "all substantive issues raised in the pleadings." *Project Release v. James Prevost,* 551 F.Supp. 1298, 1310 (E.D.N.Y. 1982). Appellants contend initially that it was error to dispose of their claims via summary judgment; next, they contend that the district judge erred in holding that the challenged provisions of the M.H.L. are facially constitutional. For the reasons stated below, we reject these claims and affirm the decision of the district court.

## I. PROCEDURAL BACKGROUND

Appellant Project Release is a not-for-profit corporation composed of persons who are or have been in New York State mental hospitals as either voluntary, involuntary or emergency patients. Appellant Carrie Greene was a patient at Creedmoor Psychiatric Center in Queens, New York, when this action was filed but has since been released. Defendants are various New York State officials responsible for administering the New York State M.H.L.

On July 10, 1978, appellants filed suit in the United States District Court for the Eastern District of New York,[2] alleging that the standards and procedures embodied in M.H.L. §§ 9.13 (voluntary), 9.27 (involuntary) and 9.39 (emergency) violate appellants' Fourteenth Amendment substantive and procedural due process rights. They sought a declaration, *inter alia,* that the above-noted provisions, and confinements pursuant thereto, violate the Fourteenth Amendment; that M.H.L. § 29.09 unconstitutionally requires the Mental Health Information Service (MHIS)[3] to be both counsel for the patient and independent investigator for the court (adequacy of counsel claim); and that commitment standards and procedures should conform to certain guidelines proffered by appellants.[4] Appellants also alleged the following facts as to named plaintiff Carrie Greene: Greene was

---

1. *See* N.Y. Mental Hyg. Law (M.H.L.) §§ 9.13 (voluntary admissions); 9.27 (involuntary admission on medical certification); 9.37 (involuntary admission on certificate of a director of community services or his designee); 9.39 (emergency admissions for immediate observation, care, and treatment) (McKinney 1978). The M.H.L. also provides for "informal" patient status. Persons admitted as informal patients are free to leave the institution upon their own written request. *Id.* § 9.15. Appellants have not challenged the standards or procedures applicable to informal patient status.

2. Class certification was sought by appellants in the district court but was not ruled upon.

3. The Mental Health Information Service (MHIS), which exists in each judicial department of the New York State Supreme Court, provides information and assistance to patients and others interested in their welfare. *See* M.H.L. § 29.09. The MHIS is charged with a variety of duties, including the following: to study and review admission and retention of patients; to inform patients concerning proce-

dures for admission and retention and of patients' rights to judicial hearing and review, legal representation, and independent medical opinion; in any case before a court, to assemble for the court relevant information concerning a patient's case, hospitalization, right to discharge; and to investigate cases of alleged patient abuse. *Id.*

4. Specifically, appellants sought to have the court declare that commitment standards should require, *inter alia,* that a person be shown (a) to present a substantial and present risk of serious physical harm to himself or others and (b) to have recently committed an act which caused or reasonably should have caused serious physical harm to himself or others; and that commitment procedures should require, among other things, (a) automatic hearings within 48 hours (probable cause) and five days (full commitment hearing) of confinement; (b) that adequate counsel be provided at both hearings; (c) that the person have a full statement of the specific facts leading to confinement (including full access to his hospital

admitted on an emergency basis (M.H.L. § 9.39) to Creedmoor Psychiatric Center on April 22, 1978; received no judicial hearing until thirteen days later, on April 24, 1978; was converted to voluntary status (M.H.L. § 9.13) on April 28, 1978; pursuant to M.H.L. § 9.13 gave notice of her desire to leave but was not permitted to do so; on May 4, 1978 was converted to involuntary status (M.H.L. § 9.27) (with signatures of two physicians); requested release on May 11, 1978; and on May 23, 1978 was denied release after a hearing before New York State Supreme Court Justice Dufficy.[5] Although not specifically alleged in the complaint, appellants apparently claim on appeal that Greene's admission was not in accord with the notice and hearing requirements of the M.H.L.

On September 6, 1979, appellants moved for partial summary judgment as to those portions of their complaint constituting a facial challenge to the standards and procedures for involuntary and emergency commitment.[6] In their Memorandum of Law for Defendants in Opposition to Plaintiffs' Motion for Partial Summary Judgment (Memorandum in Opposition), filed on November 5, 1979, appellees impliedly cross-moved[7] for summary judgment declaring constitutional New York's voluntary admission standards, as well as the procedures applicable to voluntary, involuntary and emergency commitments.[8]

record); and (d) that drugs or treatment not be administered without consent prior to the conclusion of the final hearing unless required to preserve the person's life.

5. Greene was represented by MHIS, *see supra* note 3, at the hearing before Justice Dufficy. Amended Answer of defendants Gottlieb, Besunder, Donnelly, and Kearney ¶ 5. The Amended Answer also alleged that on June 22, 1978, the hospital applied for an order of retention; on June 23, 1978, attorney Christopher Hansen appeared on behalf of Greene and sought a jury review of Justice Dufficy's order; that the two proceedings were heard jointly before Justice Giacco and a jury on July 19, 20 and 21, 1978; that a verdict for plaintiff's retention was rendered and Greene was ordered retained; and that on December 29, 1978, Greene was discharged from Creedmoor Psychiatric Center.

6. Appellants expressly excluded from their motion those portions of the complaint challenging the constitutionality of voluntary commitment *standards and procedures and those portions* challenging the adequacy of counsel provided to those so committed. Memorandum of Law in Support of Plaintiffs' Motion for Partial Summary Judgment at 1–2.

7. No formal cross-motion was made, although it appears that the court, and all parties, understood that appellees had made an implied cross motion. *See* appellants' Statement of Material Facts as to which there ·is a Genuine Issue Pursuant to Local Rule [3](g) in response to Defendants' Implied Motion for Partial Summary Judgment re Constitutionality of "Voluntary" Commitments; *see also* Memorandum of Law for Defendants in Opposition to Plaintiffs' Motion for Partial Summary Judgment (Memorandum in Opposition) at 5–6 ("While plaintiffs are not moving for summary judgment on that part of their complaint seeking to declare the voluntary admission standards unconstitutional, the civil commitment system in New York must be looked upon as a whole in deciding the merits of plaintiffs' claims, as well as the defendants' [implied] motion for summary judgment on the standards for voluntary admission.").

8. Specifically, the appellees requested the court "to declare that such [procedural] standards [applicable to voluntary, involuntary and emergency admissions] are fundamentally fair and adequately protect the due process rights of patients." Memorandum in Opposition at 45. Appellees' Memorandum in Opposition was supported by affidavits of James A. Prevost, M.D. (Commissioner of the New York State Office of Mental Health) and Yoosuf A. Haveliwala, M.D. (then Director of Creedmoor Psychiatric Center) and was accompanied by a Rule [3](g) Statement of Material Facts. In the Statement of Material Facts, appellees contended, *inter alia,* that there is no material fact at issue that appellants' proposed standards and procedures for involuntary commitment are inappropriate, that the present standards for emergency admission conform to those proposed by appellants, and that the voluntary and involuntary admission standards conform to those approved by the United States Supreme Court. In their Reply Memorandum in Support of their *Motion for Partial Summary Judgment* (Reply Memorandum), appellants set forth what they perceived to be appellees' positions, to wit:

1. Plaintiffs' motion concerning the constitutionality of standards for commitment and concerning the right to refuse drugs prior to a hearing should be denied because there are material facts in dispute.

Construing appellants' complaint as a facial attack on the entire civil commitment scheme, and appellees' submissions as a motion to declare the entire scheme constitutional on its face, Judge Neaher granted summary judgment for the appellees on all substantive and procedural issues raised by the parties. *Project Release v. James Prevost,* 551 F.Supp. 1298 (E.D.N.Y.1982).

## II. THE NEW YORK STATE MENTAL HYGIENE LAW

Appellants do present a facial federal constitutional challenge to civil commitment standards and procedures contained in the M.H.L. More specifically, at issue are sections 9.13, 9.27, 9.37 and 9.39, which provide for voluntary, involuntary and emergency civil commitment, respectively. *See supra* note 1. These provisions will be summarized below.

### A. Standards

#### 1. Voluntary

Under section 9.13 (voluntary), a hospital director may receive as a patient "any suitable person in need of care and treatment, who voluntarily makes written application therefor." To be "suitable," the individual must be notified of and be able to understand that the hospital to which he is requesting admission is a mental hospital and that he is applying for admission, and the nature of voluntary status and the provisions governing release or conversion to involuntary status. M.H.L. § 9.17(a). To be "in need of care and treatment," the applicant must have a "mental illness for which in-patient care and treatment in a hospital is appropriate." *Id.* § 9.01. "Mental illness" is defined as "an affliction with a mental disease or mental condition which is manifested by a disorder or disturbance in behavior, feeling, thinking, or judgment to such an extent that the person afflicted requires care, treatment and rehabilitation." *Id.* § 1.03(20) (applicable to all admissions).

#### 2. Involuntary

Admission criteria under section 9.27 (involuntary admission on medical certification) are more restrictive, requiring some measure of judgmental impairment. Such an individual must be shown to be "mentally ill and in need of involuntary care and treatment," meaning "that [the] person has a mental illness for which care and treatment as a patient in a hospital is essential to such person's welfare and whose judgment is so impaired that he is unable to

2. Plaintiffs' motion concerning the constitutionality of commitment procedures (hearing, notice, and self-incrimination) should be denied. The defendants' *implied cross-motion for summary judgment* on these issues should be granted.

3. Defendants' *implied motion for summary judgment* concerning the constitutionality of voluntary commitments should be granted.

Reply Memorandum at 2 (emphasis added). Along with their Reply Memorandum, appellants submitted a Rule [3](g) Statement setting forth what they viewed as genuine issues of material fact with respect to the voluntary commitment scheme, to wit:

1. "Voluntary" patients (those committed pursuant to M.H.L. § 9.13) are not genuinely voluntary because they cannot leave the hospital when they want to.

2. Many "voluntary" patients are not genuinely voluntary because they are coerced into signing "voluntary" commitments.

3. Persons wanting to be admitted as genuinely voluntary patients can be admitted by using M.H.L. § 9.15 which provides for "informal" admissions.

4. No person genuinely desiring hospitalization would be denied it if plaintiffs were granted every item of relief.

5. An "informal" patient is genuinely voluntary because "such patient shall be free to leave such hospital at any time after such admission."

6. The defendants actively discourage "informal" admission.

7. "Voluntary" patients are treated substantially the same as involuntary patients in the hospital.

There is nothing in the record indicating that appellants submitted affidavits or other evidentiary material either with their initial partial summary judgment motion or with their Reply Memorandum.

In addition to contending that summary judgment "should be decided on defendants' implied cross motion for summary judgment as to the constitutionality of 'voluntary' commitments because there are genuine issues of material fact," appellants reasserted their request for summary judgment declaring New York's commitment standards and procedures unconstitutional. *See* Reply Memorandum at 6–28.

understand the need for such care and treatment." *Id.* §§ 9.27, 9.01. Involuntary commitment pursuant to M.H.L. § 9.37 (on certificate of a director of community services or his designee) applies to persons who have "a mental illness for which immediate inpatient care and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or others." "Likelihood of serious harm" is defined in the statute as follows:

> 1. substantial risk of physical harm to himself as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that he is dangerous to himself, or
> 2. a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear [of] serious physical harm.

*Id.* § 9.37(a)(1) & (2).

Finally, for a person to be admitted as an emergency involuntary patient under section 9.39, he must have "a mental illness for which immediate observation, care, and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or others." "Likelihood to result in serious harm" is defined for purposes of section 9.39 in the same way as for section 9.37. *Id.* § 9.39(a)(1) & (2).

### B. Procedures

Upon admission of any patient to a hospital or upon conversion to a different status, the director must inform the patient in writing of his status, his rights under the statute, including the availability of MHIS, and conspicuous, visible written notice must be posted of those rights throughout the hospital. *Id.* § 9.07. In addition, various procedural safeguards attach to the different types of admission. These procedures are set forth below.

1. Voluntary and conversion to involuntary

If a patient is hospitalized under section 9.13, MHIS must conduct a yearly review of the patient's status, *id.* § 9.25(a), and must move for a judicial determination if there is any doubt as to the suitability or willingness of an individual for voluntary hospitalization. *Id.* In connection with such a proceeding, a court hearing may be obtained upon request by MHIS, the patient or a person acting in his behalf. *Id.* If a voluntarily committed patient gives written notice to the hospital director of his desire to leave, he must be "promptly" released from the hospital, *id.* § 9.13(b), unless the director determines that "there are reasonable grounds for belief that the patient may be in need of involuntary care and treatment." *Id.* In that case, the patient may be retained for up to seventy-two hours of the patient's written notice. *Id.* During the seventy-two-hour period, the director must have two physicians examine the patient and report their findings and conclusions separately to the director, who must then either release the patient or apply for a court order authorizing involuntary retention. 14 N.Y.C.R.R. § 15.7 (1980).

When the director applies for an order of conversion from voluntary to involuntary status, written notice must be given forthwith to the patient, the patient's nearest [known] relative, MHIS and as many as three additional persons designated to receive notice—any of whom may demand a judicial hearing on the question of mental illness and the need for involuntary hospitalization. The hearing, if requested, must be held within three days of receipt by the court of the demand for such. *See* M.H.L. §§ 9.13(b), 9.29. The procedures for court authorization for retention of an involuntary patient, *id.* § 9.33, then apply. *Id.* § 9.13(b). If the court orders involuntary retention, that period cannot exceed sixty days from the date of the court order. *Id.* Further retention may only be had in accordance with these procedures. Rehearing before a jury, if so desired, may be obtained upon request by the patient, relative or friend. *Id.* § 9.35.

2. Involuntary

An initial involuntary commitment, pursuant to M.H.L. § 9.27, requires certification by two examining physicians and an

application for admission by one of a number of designated persons. *Id.* § 9.27(a), (b). Before an examining physician completes the necessary certificate for admission, he must consider alternative forms of care and treatment besides involuntary hospitalization. *Id.* § 9.27(d). A person may not be involuntarily admitted unless a third (staff) physician also certifies, after examination, that such person is in need of involuntary care and treatment. *Id.* § 9.27(e). MHIS must be notified immediately of a patient's involuntary admission, *id.* § 9.29(a), and must inform the patient of his statutory rights. *Id.* § 29.09(b)(2). Written notice must also be given to the patient's nearest [known] relative, and up to three additional persons designated by the patient, no later than five days after admission. *Id.* § 9.29(b).

An individual admitted pursuant to section 9.27 may be retained without court authorization for up to sixty days. *See id.* § 9.33. During the sixty days retention, the patient, relative or friend, or MHIS may request a hearing on the question of the need for involuntary commitment. *Id.* § 9.31(a).[9] Such a hearing must be held within five days of receipt of a request. *Id.* § 9.31(c). The burden of initiating an application for retention beyond sixty days is upon the hospital director, who must apply for a court order no later than sixty days from the date of admission or thirty days from the date of a court order denying release, whichever is later. *Id.* § 9.33(a). Written notification of such an application must be given to the patient, with copies to MHIS and to other designated persons. *Id.* Without a court order of continued retention, or the consent of the patient, the hospital must release the patient. A patient has a right to counsel at any hearing relating to his request for release or continued retention, and counsel will be provided free of charge if the patient is indigent. N.Y. Jud.Law § 35(1)(a) (McKinney 1983).

To be involuntarily committed pursuant to section 9.37, a person must be examined by a director of community services or his designee. M.H.L. § 9.37(b). The need for immediate hospitalization must be confirmed by a staff physician prior to admission. *Id.* § 9.37(a). Such patient may not be involuntarily retained beyond seventy-two hours unless an additional staff physician certifies the need for retention. *See id.* The procedural safeguards relating to admissions pursuant to section 9.27 (notice, hearing, review, judicial approval of continued retention) apply to section 9.37 admissions. *Id.*

An emergency involuntary admission, pursuant to M.H.L. § 9.39, may not exceed fifteen days. *Id.* § 9.39(a). However, retention cannot extend beyond forty-eight hours if the original physician's finding of need for emergency admission is not confirmed within that period by a second medical opinion. *Id.* § 9.39(a). As with involuntary admission, notification must be given to MHIS and certain designated individuals, any of whom may request a hearing which must be held no later than five days after the request is received. *Id.* Upon expiration of the fifteen days, if the patient does not choose to remain hospitalized on a voluntary or informal basis, he must either be discharged or be admitted as an involuntary patient (pursuant to M.H.L. § 9.27 with the procedural safeguards, previously described, that attach thereto). *Id.* § 9.39(b).

### C. Regulations Governing Right to Object to Treatment

Title 14 of the New York Code Rules and Regulations (N.Y.C.R.R.) sections 27.8 and 27.9 provide for a right to object to treatment and for review of such an objection. Patients on voluntary or informal status may not be given treatment over their objection unless "the treatment appears necessary to avoid serious harm to life or limb of the patients themselves." 14 N.Y.C.R.R. § 27.8(b)(1) (emergency treatment), § 27.-8(b)(2) (patients on voluntary or informal status). An involuntary patient may object

---

**9.** In some cases, such as patient abuse, MHIS is required to request a hearing. *See* M.H.L. § 29.09(b)(5).

to non-emergency treatment and has a right to appeal. Before treatment may be administered over a patient's objection, the head of the service must review the objection. *Id.* § 27.8(c). The patient may appeal the decision by the head of the service to the facility director, *id.* § 27.8(c), (e)(1) & (2), and then to the regional director of the department, *id.* § 27.8(e)(3). A patient who objects to treatment has a right to request an attorney (or "other concerned person") to represent him in the appeal proceedings. *Id.* § 27.8(d). Treatment may not be imposed over religious objection without a court order. *Id.* § 27.8(b)(3)(ii). Nor may electro-convulsive therapy, surgery, major medical treatment or experimental drugs or procedures be administered without informed consent of the patient or a person authorized to act on his behalf after full and comprehensive disclosure of potential benefits or harm. *Id.* § 27.9; *see also* M.H.L. § 33.03(b)(4) (consent required for "surgery, shock treatment, major medical treatment in the nature of surgery, or the use of experimental drugs or procedures"). The MHIS must be informed of the review of any objection to treatment throughout the course of the objection and appeal process. More generally, no treatment or therapy may be administered without "the order of a staff member operating within the scope of a professional license," based on an appropriate examination. M.H.L. § 33.-03(b)(3).

### III. DISCUSSION

Appellants' arguments to this court are twofold. First, appellants assert that because they had specifically excluded from their summary judgment motion the question of adequacy of counsel, and were not on notice that the court would rule on this issue, summary judgment was improperly granted as to that claim. Moreover, appellants argue that material questions of fact existed as to the application of the New York State Mental Hygiene Law prescribing standards and procedures for voluntary, involuntary and emergency commitment (including administration of medication without consent), and that granting of summary judgment as to their "as ap-

plied" challenge constituted an improper dismissal of that challenge. Second, appellants appeal from the district judge's ruling that the portions of the statute at issue are constitutional on their face, as to both standards and procedures provided for therein. For the reasons set forth below, we reject appellants' arguments.

### A. Summary Judgment

A party moving for summary judgment has the burden of demonstrating the absence of a genuine issue of material fact. Fed.R.Civ.P. 56(c); *see Adickes v. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *United States v. One Tintoretto Painting,* 691 F.2d 603, 606 (2d Cir.1982); *United States v. Pent-R-Books, Inc.,* 538 F.2d 519, 529 (2d Cir.1976), *cert. denied,* 430 U.S. 906, 97 S.Ct. 1175, 51 L.Ed.2d 582 (1977). Ambiguities or inferences to be drawn from the facts must be viewed in a light most favorable to the party opposing the summary judgment motion. *See Adickes,* 398 U.S. at 157, 90 S.Ct. at 1608. *One Tintoretto Painting,* 691 F.2d at 606. However, mere allegations in the non-moving party's pleadings are insufficient to show that there is a triable issue of fact if the moving party has made the necessary Rule 56(c) showing. Fed.R.Civ.P. 56(e); *see also Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir.1980) (opposing party " 'may not rest upon mere conclusory allegations or denials.' "); *Pent-R-Books,* 538 F.2d at 529 (If the moving party carries its preliminary burden, the opposing party may not defeat the motion by relying on the contentions of its pleading; rather, it must produce "significant probative evidence tending to support [its position].") (citations omitted); *Kletschka v. Driver,* 411 F.2d 436, 449 (2d Cir.1969) (General allegations which may have been sufficient to state a cause of action in the complaint become insufficient once opposed by a motion for summary judgment supported by affidavits.); *see also In re B.D. International Discount Corp. v. Chase Manhattan Bank,* 701 F.2d 1071, 1077 n. 11 (2d Cir.1983); *see generally* 10A C. Wright, A. Miller & M. Kane, *Federal*

*Practice and Procedure* § 2727 (1983). A non-moving party may not rely on mere conclusory allegations but must set forth "concrete particulars." *See SEC v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1978). A court may grant summary judgment *sua sponte* when it is clear that a case does not present an issue of material fact. *FLLI Moretti Cereali v. Continental Grain Co.,* 563 F.2d 563, 565 (2d Cir.1977); *see also Lowenschuss v. Kane,* 520 F.2d 255, 261 (2d Cir.1975). Moreover, a district judge may grant summary judgment to a non-moving party, if no genuine issues of material fact have been shown. *See Betts v. Coltes,* 467 F.Supp. 544, 546 (D.Haw. 1979), *vacated and remanded on other grounds,* 659 F.2d 1000 (9th Cir.1981); *Moss v. Ward,* 450 F.Supp. 591, 594 (W.D.N.Y. 1978); *see generally* 6 J. Moore, *Moore's Federal Practice* ¶ 56.12 (2d ed. 1971 & Supp.1982–83).

Appellants contend principally that the district court erred in granting summary judgment with respect to the issues of adequacy of counsel and their "as applied" challenge to the voluntary commitment scheme and other aspects of the M.H.L. Bearing in mind the principles set forth above—in particular, the requirement that there exist genuine issues of material fact—we find no error in the district court's handling of the subject motions.

### 1. Adequacy of Counsel

[ ] Appellants specifically sought to exclude from their motion for partial summary judgment the question of adequacy of counsel. They argue that they were not on notice that the district judge would rule on this question and assert that there were genuine issues of material fact as to whether mental patients are afforded adequate representation, thus making summary judgment improper. In our view, the parties may be deemed to have been on notice that the counsel issue was before the district judge, and we conclude that the issue prop-

erly could have been disposed of as a legal question on summary judgment.

The district judge found that "in their supporting memoranda, plaintiffs did address this [counsel] issue, stating that the right to have MHIS present as counsel at discussions between a patient and hospital staff was guaranteed by M.H.L. § 29.09 . . . [and that defendants noted in their Memorandum in Opposition that] involuntarily committed individuals also have the right to have counsel present at court hearings, and indigent patients may have counsel appointed." 551 F.Supp. at 1303 n. 2. The district judge stated that "the right to have MHIS present as counsel at discussions between a patient and hospital staff [guaranteed by M.H.L. § 29.09] . . . already exceeds constitutional prescriptions." *Id.* (citing *Lynch v. Baxley,* 386 F.Supp. 378, 389 n. 5 (M.D.Ala.1974) and *Lessard v. Schmidt,* 349 F.Supp. 1078, 1100 (E.D.Wis. 1972)). The court concluded: "Certainly, an argument that New York's civil commitment statute is unconstitutional on its face cannot be supported on this ground." *Id.*

We find no error in this determination. First, in our view, the district judge had a basis from which he could conclude that appellants were on notice that the appellees had impliedly cross-moved with respect to *all* procedural aspects of the commitment scheme, and, therefore, that the adequacy of counsel issue was before the court. *See* Appellants' Reply Memorandum in Support of their Motion for Partial Summary Judgment at 2 (recognizing one of appellees' positions to be an implied motion for summary judgment concerning the constitutionality of commitment procedures, including hearing, notice and self-incrimination).[10] Moreover, we decline to accept the appellants' efforts to circumscribe the authority of the district judge to address all of the issues which he validly concluded were properly before him. The pleadings, motion papers and other submissions herein justi-

---

10. Furthermore, in appellees' Memorandum in Opposition at 74, it was noted that "it appears that plaintiffs are discontinuing their claim that current New York law violates any due process rights which they may have to a lawyer present at discussion with staff and to the free appointment of a lawyer, since the right to legal services is provided by statute." In their Reply Memorandum, appellants did not respond to this statement.

fied Judge Neaher's conclusion that the parties were on notice that these issues were before him.[11] So long as the litigants were on notice as to the issues laid before the district judge and received no leave from him to proceed piecemeal in addressing them, the judge was under no constraint to avoid ruling upon any such issue.

### 2. Constitutionality "As Applied"

According to the district judge, "[t]he resolution of the issues in this case turns on whether standards and procedures contained in the statute accord with constitutional requirements. *As presented by these parties,* the question is a legal and not a factual one, and can be determined on summary judgment." 551 F.Supp. at 1300 (citing *Gotkin v. Miller,* 514 F.2d 125, 130 (2d Cir.1975)) (emphasis added). Appellants argue that summary judgment was improper because genuine issues of material fact existed as to whether New York's voluntary, involuntary and emergency commitment standards and procedures are constitutional *as applied.* Having reviewed the record in the light most favorable to appellants, *see Adickes,* 398 U.S. at 157, 90 S.Ct. at 1608, we conclude that the district judge did not err in construing appellants' submissions as a purely *facial* challenge to the statute.

Appellants' allegations concerning individual plaintiff Carrie Greene do not alter the facial character of this action. Indeed, appellants' complaint does not allege that Greene's confinement was in contravention of the standards and procedures required by the M.H.L. Greene alleged that she was admitted as an emergency patient, pursuant to M.H.L. § 9.39. That she was not afforded a hearing until thirteen days after admission does not in and of itself constitute misapplication of the statute—an emergency patient may be held for up to fifteen days without a hearing. While Carrie Greene was unable to leave the hospital once converted to voluntary status, the statute provides for retention on such a basis, *per* section 9.13. Moreover, Greene was represented by MHIS, *see supra* note 3, at her hearing before Judge Dufficy and had access to legal counsel later in the commitment proceedings. *See supra* note 5. Thus, Greene's case appears to us, as it apparently did to the district judge, to be illustrative of the application of the statute, rather than its misapplication. As such, Greene's case does not require remand on the question of the statute's application.[12]

Our review of the record leads us to conclude that the district judge properly determined that no genuine issue of material fact was raised by the appellants. In our opinion, appellants' proffered factual issues raise no matters beyond the allegations in the pleadings; nor do they constitute the "concrete particulars" required to meet the Rule 56 standard. The district judge was not precluded from granting summary

11. As to any factual question on this issue, *see* discussion *infra* concerning constitutionality "as applied," particularly note 12.

12. Nor does appellants' Rule [3](g) Statement with respect to the voluntary commitment scheme, *see supra* note 8, in our view, raise triable issues of fact on the statute's *application.* Those assertions can be reasonably construed as a challenge to the voluntary commitment scheme *on its face.* Moreover, appellants furnished no supporting evidentiary material, either in the form of affidavits, depositions or exhibits, in connection with the motion. While we do not hold that appellants' mere failure to submit affidavits or other proof on this issue necessarily means it was not disputed, *see Lowenschuss,* 520 F.2d at 262, such bare assertions as those offered by appellants cannot serve to raise genuine issues of material fact. *See In re B.D. International Discount Corp.,*

701 F.2d at 1077 n. 11; *Pent-R-Books,* 538 F.2d at 529.

With respect to the adequacy of counsel question, appellants point out that pending the court's resolution of the summary judgment motion, appellants served, and appellees answered without objection, interrogatories directed to the adequacy of counsel claim. Those answers, appellants argue, created genuine issues of material fact with respect to the *application* of the counsel provisions. Nowhere do appellants allege, however, that any particular plaintiff was not accorded the statutory protections in this regard. Indeed, it appears that plaintiff Carrie Greene was assisted by MHIS at her hearing before Justice Dufficy and that an attorney appeared on her behalf later in the commitment process. *See supra* note 5. We therefore see no merit in appellants' contention that they placed in issue the question of constitutionality "as applied."

judgment herein. We therefore see no basis for overturning Judge Neaher's handling of this case as a broad facial challenge to the statute, and we affirm his action. However, we do not view his disposition of the alleged "as applied" challenge to the statute as a dismissal thereof. Rather, since the appellants' case did not amount to an attack on the *application* of the statutory provisions at issue herein, whether the statute is *applied* constitutionally remains an open question, the resolution of which may be accomplished only in the context of an appropriate "as applied" challenge.

### B. Facial Constitutionality

 Involuntary civil commitment to a mental institution has been recognized as "a massive curtailment of liberty," *Vitek v. Jones,* 445 U.S. 480, 491–92, 100 S.Ct. 1254, 1262–63, 63 L.Ed.2d 552 (1980); *Humphrey v. Cady,* 405 U.S. 504, 509, 92 S.Ct. 1048, 1052, 31 L.Ed.2d 394 (1972), which, because it may entail indefinite confinement, could be a more intrusive exercise of state power than incarceration following a criminal conviction. *See Colyar v. Third Judicial District Court,* 469 F.Supp. 424, 429 (D.Utah 1979) (citing *Humphrey v. Cady,* 405 U.S. at 509, 92 S.Ct. at 1052). Civil commitment for any purpose requires due process protection. *See Vitek,* 445 U.S. at 491–92, 100 S.Ct. at 1262–63; *Addington v. Texas,* 441 U.S. 418, 425, 99 S.Ct. 1804, 1808, 60 L.Ed.2d 323 (1979); *O'Connor v. Donaldson,* 422 U.S. 563, 580, 95 S.Ct. 2486, 2496, 45 L.Ed.2d 396 (1975) (Burger, C.J., concurring). Indeed, "[t]here can be no doubt that involuntary commitment to a mental hospital, like involuntary confinement of an individual for any reason, is a deprivation of liberty which the State cannot accomplish without due process of law." *O'Connor,* 422 U.S. at 580, 95 S.Ct. at 2496 (Burger, C.J., concurring). Whether the state purports to act pursuant to a *parens patriae* interest in promoting the welfare of the mentally ill, *see Rogers v. Okin,* 634 F.2d 650, 657–59 (1st Cir.1980), *vacated and remanded sub nom. Mills v. Rogers,* 457 U.S. 291, 102 S.Ct. 2442, 2447, 73 L.Ed.2d 16 (1982), or pursuant to its police power interest in preventing violence and maintaining order, 634 F.2d at 654–57;

102 S.Ct. at 2447, the state, in so acting, may not curtail or deny Fourteenth Amendment substantive or procedural due process protections in exercising such powers. *See O'Connor,* 442 U.S. at 580, 95 S.Ct. at 2496; *Specht v. Patterson,* 386 U.S. 605, 608, 87 S.Ct. 1209, 1211, 18 L.Ed.2d 326 (1967). Diminished capacity alone cannot serve to undermine protections afforded the individual's liberty interest in this area. As the United States Supreme Court has stated:

> A finding of "mental illness" alone cannot justify a State locking a person up against his will and keeping him indefinitely in simple custodial confinement. Assuming that that term can be given a reasonably precise content and that the "mentally ill" can be identified with reasonable accuracy, there is still no constitutional basis for confining such persons involuntarily if they are dangerous to no one and can live safely in freedom .... In short, a State cannot constitutionally confine without more a nondangerous individual who is capable of surviving in freedom by himself or with the help of willing and responsible family members or friends.

*O'Connor,* 422 U.S. at 575–76, 95 S.Ct. at 2493–94.

 Appellants raise questions that touch on matters of serious concern and which call for close inquiry. We are acutely aware of the severe curtailment of liberty which involuntary confinement in a mental institution can entail, and of the process that must be accorded to those who may be affected by such action of the state. We are also mindful of the state interests served in providing care for those in need of treatment for mental illness and in maintaining order and preventing violence to self and others. With these concerns in mind, and having considered the New York M.H.L. in its entirety, our inquiry leads us to conclude that the statute does meet the minimum facial requirements of due process—both substantive and procedural.

With respect to facial constitutionality, on appeal appellants present four principal arguments: (1) that involuntary commit-

ment, pursuant to M.H.L. § 9.27, without a finding of substantial and present risk of serious physical harm as evidenced by recent overt conduct, violates substantive due process; (2) that New York's involuntary and emergency commitment procedures violate due process by failing to require automatic preliminary and full commitment hearings within forty-eight hours and five days of admission, respectively; (3) that adequate counsel is not provided to persons faced with commitment to a mental institution; and (4) that non-consensual administration of antipsychotic drugs to legally competent individuals in non-emergency situations violates such persons' liberty interest in personal and bodily security. We address these questions seriatim.

### 1. Recent Overt Conduct

Sections 9.27, 9.37 and 9.39 of the M.H.L. permit involuntary civil commitment. Sections 9.37 and 9.39, as interpreted by the district judge, 551 F.Supp. at 1304, require some affirmative "overt" conduct by the individual before involuntary commitment may be imposed.[13] Appellants concede that the standards reflected in sections 9.37 and 9.39, thus interpreted, meet constitutional minima and do not challenge them on appeal. *See* Br. for Appellants at 14.

Appellants do challenge, however, as overbroad and vague, and thus violative of due process, the standard embodied in section 9.27, which permits involuntary commitment of persons with a mental illness "for which care and treatment in a hospital is essential to such persons' welfare and whose judgment is so impaired that he is unable to understand the need for such treatment." M.H.L. §§ 9.27, 9.01. Appellants argue that this standard is overbroad in that it could result in erroneous hospitalization of nondangerous individuals, thus causing unconstitutional deprivation of individual liberty; and that it is vague for failure to provide sufficiently precise standards restricting the discretion of the state personnel who administer the statute. They claim that such vagueness results in arbitrary application of the statute due to the unreliability of psychiatric prediction of

dangerous behavior. Before an individual may be involuntarily committed, appellants argue, due process requires a finding of a substantial and present risk of serious physical harm as evidenced by recent overt conduct.

In rejecting the appellants' argument in this regard, the district judge recognized that "due process does not tolerate the involuntary commitment of a nondangerous individual," 551 F.Supp. at 1304. He determined, however, that "[t]he New York involuntary commitment procedures [including those relating to section 9.27] . . . do not operate to permit the confinement of the nondangerous mentally ill," but serve to commit only persons who could not sustain themselves in the community. *See id.* Such a result is assured, Judge Neaher pointed out, by the existence of statutory safeguards, to wit, (a) involuntary commitment only if care and treatment in a hospital is essential to the individual's welfare, M.H.L. § 9.01; (b) the duty of certifying physicians to consider less restrictive alternatives to hospitalization, *id.* § 9.27(d); and (c) certification by three physicians that the individual's judgment is so impaired that he fails to understand the need for involuntary care and treatment, *id.* §§ 9.01, 9.27. The district judge concluded that a mentally ill individual who is able to make a rational decision to refuse hospitalization would not fall within the definitions of sections 9.27 and 9.01, and thus could not be involuntarily committed under that provision. 551 F.Supp. at 1304 (citing *Lessard v. Schmidt,* 349 F.Supp. 1078, 1094 (E.D.Wis.1972)).

The district judge added that an overt act requirement would superimpose criminal concepts on the civil commitment scheme in New York State. He noted that in *Addington v. Texas,* 441 U.S. 418, 425, 99 S.Ct. 1804, 1808, 60 L.Ed.2d 323 (1979), the Supreme Court observed that there are significant differences in purpose and effect between civil commitment and imprisonment pursuant to a criminal conviction:

> [T]he initial inquiry in a civil commitment proceeding is very different from the cen-

---

**13.** *See supra* text accompanying notes 8–9.

tral issue in either a delinquency proceeding or a criminal prosecution. In the latter cases the basic issue is a straightforward factual question—did the accused commit the act alleged? There may be factual issues to resolve in a commitment proceeding, but the factual aspects represent only the beginning of the inquiry. Whether the individual is mentally ill and dangerous to either himself or others and is in need of confined therapy turns on the *meaning* of the facts which must be interpreted by expert psychiatrists and psychologists.

*Id.* at 429, 99 S.Ct. at 1811 (emphasis in original). Recognizing that involuntary civil commitment "constitutes a significant deprivation of liberty that requires due process protection," *id.* at 425, 99 S.Ct. at 1809, we agree that the difference between civil and criminal confinement may nonetheless be reflected in different standards and procedures applicable in the context of each of the two systems—so long as due process is satisfied.

Moreover, in our view, section 9.27 as interpreted by a New York state appellate court, on its face embodies a standard designed to prevent the evil that appellants fear—erroneous confinement of nondangerous persons who could survive in the community. *See Scopes v. Shah,* 59 A.D.2d 203, 205–06, 398 N.Y.S.2d 911, 913 (3d Dep't 1977) ("What due process does proscribe, in our view, is the continued involuntary commitment of a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and able family members or friends."). This standard comports with the constitutional minimum set forth in *O'Connor,* 422 U.S. at 576, 95 S.Ct. at 2494. Thus, as narrowed by the New York state court's holding in *Scopes,* which requires dangerousness, the statute withstands appellants' overbreadth challenge. Finally, we acknowledge that the medical profession's ability to predict dangerousness, and the role of overt acts bearing on the issue, is hotly debated. *See, e.g.,* J. Monohan, *The Clinical Prediction of Violent Behavior* (1980); Diamond, *The Psychiatric Prediction of Dangerousness,* 123 U.Pa.L.Rev. 439 (1979); Steadman & Cocoz-

za, *Psychiatry, Dangerousness and the Repetitively Violent Offenders,* 69 J. of Crim.Law and Criminology 226, 229–31 (1978). We are not convinced that, as a practical matter, the addition of a recent overt act requirement would serve to reduce erroneous confinements pursuant to section 9.27. *See O'Connor,* 442 U.S. at 579, 95 S.Ct. at 2495 (Court notes "uncertainties of psychiatric diagnosis and therapy, and [that] the reported cases are replete with evidence of diverging medical opinion in this vexing area.") (Burger, C.J., concurring).

Since *O'Connor,* in which the Supreme Court fashioned a broad rule that prohibits involuntary confinement of a nondangerous individual capable of surviving in the community, a number of courts have considered the question of whether due process requires overt conduct as evidence of dangerousness. Some courts have found such a requirement constitutionally mandated while others have not. *Compare Colyar,* 469 F.Supp. at 434 (overt act not required); *United States ex rel. Mathew v. Nelson,* 461 F.Supp. 707, 710 (N.D.Ill.1978) (three-judge court) (same); *Scopes,* 59 A.D.2d at 206, 398 N.Y.S.2d at 913 (same), *with Suzuki v. Alba,* 438 F.Supp. 1106, 1110 (D.Haw.1977), *aff'd in part rev'd in part dismissed in part sub nom. Suzuki v. Yuen,* 617 F.2d 173, 178 (9th Cir.1980) (overt act required); *Stamus v. Leonhardt,* 414 F.Supp. 439, 451 (S.D.Iowa 1976) (same); *Doremus v. Farrell,* 407 F.Supp. 509, 514–15, 517 (D.Neb.1975) (three-judge court) (same); *see also Lynch v. Baxley,* 386 F.Supp. 378, 391 (M.D.Ala. 1974) (three-judge court) (overt act required); *Lessard v. Schmidt,* 349 F.Supp. 1078, 1093 (E.D.Wis.1972) (three-judge court) (same), *vacated on other grounds,* 414 U.S. 473, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974), *on remand,* 379 F.Supp. 1376, 1379 (E.D. Wis.1974), *vacated and remanded on other grounds,* 421 U.S. 957, 95 S.Ct. 1943, 44 L.Ed.2d 445 (1975), *on remand,* 413 F.Supp. 1318 (E.D.Wis.1976) (reinstating prior judgment).

We have reviewed these cases and are of the view that the New York State civil commitment scheme, considered as a whole

and as interpreted in *Scopes* to include a showing of dangerousness, meets minimum due process standards without the addition of an overt act requirement. We believe that further inquiry concerning the extent to which such a requirement might decrease the chance of error in predicting dangerousness may be better explored in the legislative forum. *See Rennie v. Klein,* 653 F.2d 836, 850 (3d Cir.1981) (en banc) ("A federal court is not to substitute its judgment for that of state legislative and executive authorities, unless the state's response in protecting the liberty interest falls short of constitutional standards.").

2. Hearings within a Reasonable Time

■ Appellants next argue that M.H.L. §§ 9.31 (right to a hearing for involuntary commitment pursuant to section 9.27) and 9.39 (emergency) violate due process by failing to require automatic preliminary probable cause hearings within forty-eight hours of admission, and full commitment hearings within five days of admission. Under the present scheme, persons admitted pursuant to section 9.27 may be hospitalized for up to sixty days without a judicial hearing, unless they request one; persons admitted pursuant to section 9.39 may be retained for up to fifteen days without a judicial hearing, unless requested. Were this the totality of the procedural scheme, we would indeed be inclined to question the statute's constitutional validity. However, there are numerous provisions in the statute for notice and hearing and reassessment of a patient's status by MHIS, medical personnel and judicial officers, and by a jury if so desired. On its face, this scheme reflects a careful balance between the rights of the individual and the interests of society. *See Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 2461 & n. 28, 73 L.Ed.2d 28 (1982).

We are not persuaded by those cases, cited by appellants, which required hearings sooner after admission than permitted by the New York statute. *See, e.g., Doe v. Gallinot,* 486 F.Supp. 983, 994 (C.D.Cal.1979) (probable cause hearing within seven days), *aff'd,* 657 F.2d 1017, 1025 (9th Cir.1981); *Wessel v. Pryor,* 461 F.Supp. 1144, 1146–47 (E.D.Ark.1978) (appearance before judge within twenty-four hours; probable cause hearing within seventy-two hours of appearance before judge; final hearing within twenty-one days of probable cause determination); *Doremus,* 407 F.Supp. at 517 (probable cause hearing within five days; full hearing within fourteen days); *Kendall v. True,* 391 F.Supp. 413, 419 (W.D.Ky.1975) (preliminary probable cause hearing required; final hearing within twenty-one days of confinement); *Lynch,* 386 F.Supp. at 388 (probable cause hearing within seven days; full hearing within thirty days of original detention); *Bell v. Wayne County General Hospital,* 384 F.Supp. 1085, 1098 (E.D.Mich.1974) ("prompt" preliminary hearing, but five days deemed appropriate); *Lessard,* 349 F.Supp. at 1091, 1092 (preliminary hearing within forty-eight hours; full hearing within fourteen days); *In the Matter of Tedesco,* 421 N.E.2d 726, 730 (Ind. App.1981) (probable cause hearing within seventy-two hours deemed appropriate); *State ex rel. Doe v. Madonna,* 295 N.W.2d 356, 365 (Minn.1980) (preliminary probable cause hearing within seventy-two hours). We note first that some of these cases address statutory schemes that differ in certain respects from the New York M.H.L. For example, the Wisconsin statute challenged in *Lessard* permitted confinement for 145 days without a hearing and did not provide for a right to counsel, 349 F.Supp. at 1090 & n. 14, 1097; the New York M.H.L. allows for a period of no longer than sixty days and provides for a right to counsel, at state expense if the patient is indigent. M.H.L. § 29.09(b)(2); N.Y.Jud.Law § 35(1)(a). Moreover, in *Doremus,* although the court required a final commitment hearing within fourteen days, the court did not require that the hearing be judicial in nature. 407 F.Supp. at 516. Under the New York statute, retention is not permitted beyond the statutory maximum period without a court order.

Perhaps of greater significance to us than such distinctions, however, is the notion that these cases appear to rely upon the premise that civil commitment is tantamount to incarceration for criminal conduct. We acknowledge the deprivation of liberty involved in involuntary civil commitment, but we are not prepared to invoke the same

procedural standards required in the criminal context. In this regard, as with our consideration of the overt act requirement, discussed *supra,* we find guidance in *Addington v. Texas,* where the Supreme Court recognized a distinction between civil commitment of the mentally ill and incarceration of convicted criminals. The *Addington* Court noted:

> It may be true that an erroneous commitment is sometimes as undesirable as an erroneous conviction.... However, even though an erroneous confinement should be avoided in the first instance, the layers of professional review and observation of the patient's condition, and the concern of family and friends generally will provide continuous opportunities for an erroneous commitment to be corrected.

441 U.S. at 428–29, 99 S.Ct. at 1810–11. In rejecting the reasonable doubt standard in the context of civil commitments, the Court continued, "[T]he reasonable-doubt standard is inappropriate in civil commitment proceedings because, given the uncertainties of psychiatric diagnosis, it may impose a burden the state cannot meet and thereby erect an unreasonable barrier to needed medical treatment." *Id.* at 432, 99 S.Ct. at 1812. The Court observed that "[a]s the substantive standards for civil commitment may vary from state to state, procedures must be allowed to vary so long as they meet the constitutional minimum." *Id.* at 431, 99 S.Ct. at 1812. That some states have chosen to limit pre-hearing confinement to a shorter period [14] does not mean that such a model "is needed or is even adaptable to the needs of all states." *Id.*

In our view, given "the layers of professional [and judicial] review" contained in the New York State Mental Hygiene Law's elaborate notice and hearing provisions, including notice to relatives and others designated by the patient, and the availability of a judicial hearing within five days of demand by the patient, relative or friend, as well as habeas corpus relief, we find that the statute meets procedural due process minima. *Cf. Parham v. J.R.,* 442 U.S. 584, 606–09, 99 S.Ct. 2493, 2506–07, 61 L.Ed.2d 101 (1979) (no adversarial judicial proceeding required at any stage of the commitment process in juvenile civil commitment scheme); [15] *Logan v. Arafeh,* 346 F.Supp. 1265, 1268–69 (D.Conn.1972) (forty-five day pre-hearing confinement held constitutional), *aff'd mem. sub nom. Briggs v. Arafeh,* 411 U.S. 911, 93 S.Ct. 1556, 36 L.Ed.2d 304 (1973).

As the district judge noted herein, due process issues "should not be resolved 'in terms of required days, hours, or minutes, but should rather turn on the basis of the interests involved and fundamental fairness,'" 551 F.Supp. at 1306 (quoting *French v. Blackburn,* 428 F.Supp. 1351, 1355 (M.D. N.C.1977), *aff'd mem.,* 443 U.S. 901, 99 S.Ct. 3091, 61 L.Ed.2d 869 (1979)); *see also Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972) ("[D]ue process is flexible and calls for such procedural protections as the particular situation demands."). In the context of the New York State statute as a whole, given the availability of hearings, counsel and periodic status review, in our view, the time periods embodied in the M.H.L. fall within the bounds of procedural due process.[16]

---

**14.** *See, e.g.,* Ill.Ann.Stat. ch. 91½, §§ 3–611, 3–706 (West Supp. 1983–84); Pa.Stat.Ann. tit. 50, §§ 7302(d), 7303(b), 7304(b)(4) (West Supp. 1983–84).

**15.** The *Parham* Court distinguished society's reaction to an individual's civil commitment from the "community response resulting from being labeled by the state as delinquent, criminal, or mentally ill and possibly dangerous." 442 U.S. at 600, 99 S.Ct. at 2503 (citing *In re Gault,* 387 U.S. 1, 23, 87 S.Ct. 1428, 1441, 18 L.Ed.2d 527 (1967); *Paul v. Davis,* 424 U.S. 693, 711–12, 96 S.Ct. 1155, 1165, 47 L.Ed.2d 405 (1976)).

**16.** As part of their procedural due process challenge, appellants argue that due process requires that patients be given pre-hearing notice of the facts underlying their commitment, including full access to hospital records. As to notice, they claim that the M.H.L. § 9.33 notice provision does not meet due process standards. *See* M.H.L. § 9.33(a) (when state seeks court order of continued involuntary retention, "[t]he director shall cause written notice of such application to be given the patient [with copies to relative and/or friends];" patient notified of right to hearing). We believe that the various M.H.L. notice provisions satisfy due process. In addition to section 9.33(a), upon admission

### 3. Adequacy of Counsel

As to appellants' adequacy of counsel claim, to the extent that we may deem the district judge to have ruled on the issue, *see supra* Section III.A.1. and 551 F.Supp. at 1303 n. 2, and to the extent that we may construe appellants' submissions on appeal as having put the question before us, we believe that the M.H.L. sufficiently protects whatever right to counsel appellants may have. Recent cases indicate that a right to counsel exists where an individual's physical liberty is threatened by the state's action. *See Lassiter v. Department of Social Services,* 452 U.S. 18, 25–27, 101 S.Ct. 2153, 2158–2159, 68 L.Ed.2d 640 (1981); *see also Gagnon v. Scarpelli,* 411 U.S. 778, 790, 93 S.Ct. 1756, 1763, 36 L.Ed.2d 656 (1973) (probation revocation hearings); *In re Gault,* 387 U.S. 1, 36–37, 87 S.Ct. 1428, 1448, 18 L.Ed.2d 527 (1967) (juvenile delinquency proceedings); *cf. Vitek,* 445 U.S. at 495–97, 100 S.Ct. at 1264–66 (prisoner challenging attempted transfer to mental institution). Some courts have explicitly recognized a right to counsel in civil commitment proceedings. *See, e.g., Heryford v. Parker,* 396 F.2d 393, 396 (10th Cir.1968); *Dixon v. Attorney General,* 325 F.Supp. 966, 974 (M.D. Pa.1971); *In re Hop,* 29 Cal.3d 82, 94, 623 P.2d 282, 289, 171 Cal.Rptr. 721, 728 (1981); *In re Fisher,* 39 Ohio St.2d 71, 72, 313 N.E.2d 851, 858 (1974); *cf. Thornton v. Corcoran,* 132 U.S.App.D.C. 232, 407 F.2d 695, 701 (1969) (matter considered in context of mental examination requested when accused raises insanity issue; counsel not required at psychiatric staff conference); *United States v. Albright,* 388 F.2d 719, 726 (4th Cir.1968) (when mental examination requested by prosecution, counsel not required at psychiatric interview).

A right to counsel in civil commitment proceedings may be gleaned from the Supreme Court's recognition that commitment involves a substantial curtailment of liberty and thus requires due process protection. *Addington,* 441 U.S. at 425–27, 99 S.Ct. at 1808–10. That New York law specifically provides for a right to counsel, at state expense if necessary, in any judicial proceeding concerning a patient's commitment, retention or status, and throughout any appeal concerning objection to medication, in our view, sufficiently protects this right. *See* M.H.L. § 29.09(b)(2); N.Y.Jud.Law § 35(1)(a); 14 N.Y.C.R.R. § 27.8(d). That MHIS may also serve this function does not undermine the statute's facial validity. Nor are we prepared to require that legal counsel be guaranteed at pre-hearing psychiatric interviews. *See Lynch,* 386 F.Supp. at 389 n. 5 (recognizing right to counsel in involuntary civil commitment proceedings "at all significant stages," meaning at "all judicial proceedings"); *Lessard,* 349 F.Supp. at 1100 (recognizing right to counsel in connection with civil commitment proceedings, but not requiring same at psychiatric interview). We therefore conclude that appellant's adequacy of counsel claim provides no basis for finding the M.H.L. constitutionally defective in this respect.

or change of status, a patient receives written notice of his status (including the M.H.L. section under which he is hospitalized) and of his rights under the statute (including the availability of MHIS). In addition, MHIS has a duty to inform patients (and other interested persons, in proper cases) about admission and retention procedures (including patients' rights to have judicial hearing and review, to be represented by legal counsel, and to seek independent medical opinion). *Id.* § 29.09(b)(2).

As to access to hospital records, appellants argue that without complete access, they are denied their right to participate fully in hearings challenging their hospitalization. We disagree. Whether public policy prohibits or encourages such access to medical records as appellants propose appears to be unresolved in professional circles. *See, e.g.,* Stein, Furedy, Simonton & Neuffer, *Patient Access to Medical Records on a Psychiatric Inpatient Unit,* 136:3 Am.J. Psychiatry 327 (1979). Some courts have suggested that full access to hospital records could result in harm to the mentally ill individual. *See, e.g., Gotkin v. Miller,* 379 F.Supp. 859, 866 (E.D.N.Y.1974), *aff'd,* 514 F.2d 125 (2d Cir.1975); *French,* 428 F.Supp. at 1357 n. 10. In our opinion, that patients are not permitted full access to their hospital records does not undermine protection of their right to a hearing. M.H.L. § 33.13(c)(3) permits release of patients' records "to [*inter alia*] attorneys representing patients in proceedings in which the plaintiffs' involuntary hospitalization is at issue." We find that due process does not require more.

### 4. Right to Refuse Treatment with Antipsychotic Medication

Appellants argue that in nonemergency situations, appellees may not administer antipsychotic (psychotropic) medications [17] to legally competent, but involuntarily committed, individuals prior to a judicial commitment hearing. Nonconsensual administration of such medications, appellants contend, violates the individual's constitutionally protected liberty interest in personal and bodily integrity, and can diminish one's ability to participate effectively in a commitment hearing. In assessing this claim, we note:

> This question has both substantive and procedural aspects.... [T]he substantive issue involves a definition of that protected constitutional interest, as well as identification of the conditions under which competing state interests might outweigh it. The procedural issue concerns the minimum procedures required by the Constitution for determining that the individual's liberty interest actually is outweighed in a particular instance.

*Mills v. Rogers,* 457 U.S. 291, 299, 102 S.Ct. 2442, 2448, 73 L.Ed.2d 16 (1982) (citations omitted). Thus, we must determine first, as a substantive matter, whether such a liberty interest exists and, second, whether the procedures embodied in 14 N.Y.C.R.R. § 27, *see supra* Section II.C., satisfy minimum due process requirements.

The question of whether involuntarily committed mental patients have a constitutionally protected right to refuse antipsychotic medication was recently before the United States Supreme Court in *Mills v. Rogers.* In *Mills,* the district court, in *Rogers v. Okin,* 478 F.Supp. 1342, 1365–67 (D.Mass.1979), had held that an involuntarily committed patient has constitutionally protected liberty and privacy interests in deciding whether to submit to antipsychotic drugs. *See* 457 U.S. at 295, 102 S.Ct. at 2446. That right, the district court noted, could not be overridden except in an emergency, which it defined as a "situation in which a failure to [medicate forcibly] would result in a substantial likelihood of physical harm to that patient, other patients, or to staff members of the institution." 478 F.Supp. at 1365. Absent an emergency, the district court added, an individual could not be forcibly medicated without an adjudication of incompetency. *Id.* at 1363–64. The United States Court of Appeals for the First Circuit affirmed the district court's holding that a mental patient has a constitutionally protected interest in deciding whether to submit to treatment with antipsychotic drugs. *Rogers v. Okin,* 634 F.2d 650, 653 (1st Cir.1980). The circuit court disagreed with the district court, however, as to the circumstances in which state interests might override the individual's interest in refusing treatment. The court identified two state interests that must be weighed against that of the individual: (1) a police power interest in maintaining institutional order and preventing violence, *id.* at 655, and (2) a *parens patriae* interest in providing care to the mentally ill, *id.* at 657. As to the former, the circuit court held that medical staff must enjoy substantial discretion in deciding when an emergency may require nonconsensual medication. *Id.* at 656–57. That discretion, however, is not unlimited, but "must be the result of a determination that the need to prevent violence in a particular situation outweighs the possibility of harm to the medicated individual." *Id.* at 656.[18]

---

**17.** "Antipsychotic (psychotropic) medications" refers to drugs such as Thorazine, Mellaril, Prolixin and Haldol, which apparently may pose various risks, including neurological syndromes. *See Mills v. Rogers,* 457 U.S. 291, 293 n. 1, 102 S.Ct. 2442, 2445 n. 1, 73 L.Ed.2d 16 (1982); *Rogers v. Okin,* 478 F.Supp. 1342, 457 U.S. 291, 1360 (D.Mass.1979); Byck, *Drugs and the Treatment of Psychiatric Disorders* in L. Goodman & A. Gilman, *The Pharmacological Basis of Therapeutics* 169–72 (5th ed. 1975).

**18.** In remanding to the district court, the Court of Appeals noted:

> [T]he [district] court should limit its own role to designing procedures for ensuring that the patients' interests in refusing antipsychotics are taken into consideration and that antipsychotics are not forcibly administered absent a finding by a qualified physician that those interests are outweighed in a particular situation and less restrictive alternatives are unavailable.

634 F.2d at 657.

As to the *parens patriae* interest, the circuit court held that the state could impose forced medication to prevent further deterioration of the patient's mental health. *Id.* at 659–60. The court pointed out, however, that the *sine qua non* for a state's reliance on *parens patriae* power to force medication with antipsychotic drugs "is a determination that the individual to whom the drugs are to be administered lacks the capacity to decide for himself whether he should take the drugs." *Id.* at 657 (citing *Winters v. Miller,* 446 F.2d 65, 71 (2d Cir.), cert. denied, 404 U.S. 985, 92 S.Ct. 450, 30 L.Ed.2d 369 (1971)).[19]

In 1981, the United States Supreme Court granted certiorari principally on the question of whether an involuntarily committed mental patient has a constitutional right to refuse treatment with antipsychotic drugs. *Okin v. Rogers,* 451 U.S. 906, 101 S.Ct. 1972, 68 L.Ed.2d 293 (1981); *see also Mills,* 457 U.S. at 298–99, 102 S.Ct. at 2448. Shortly thereafter, before the Court ruled on the case, the Supreme Judicial Court of Massachusetts decided *In the Matter of Guardianship of Richard Roe III,* 383 Mass. 415, 421 N.E.2d 40 (1981). *Roe III* addressed the question of whether the guardian of a non-

institutionalized but mentally ill individual had the authority to consent to forced antipsychotic medication of his ward, absent an emergency. *Id.* at ——, 421 N.E.2d at 42. The Supreme Judicial Court noted that a person " 'has a constitutionally protected interest in being left free by the state to decide for himself whether to submit to the serious and potentially harmful medical treatment that is represented by the administration of antipsychotic drugs.' " *Id.* at ——, 421 N.E.2d at 51 & n. 9 (quoting *Rogers v. Okin,* 634 F.2d at 653); *see also Mills,* 457 U.S. at 303, 102 S.Ct. at 2449.[20] The state appellate court grounded this right in the federal constitutional right to privacy as well as the common law of Massachusetts, 383 Mass. at ——, 421 N.E.2d at 42 n. 1, 51 n. 9,[21] noting that the right could only be overriden by "an overwhelming State interest," *id.* at ——, 421 N.E.2d at 51.[22]

The Supreme Court, in *Mills v. Rogers,* supra, did not resolve the question of the right to refuse antipsychotic medication on federal constitutional grounds. Rather, "[it] assum[ed] for purposes of [its] discussion that involuntarily committed mental patients do retain liberty interests protect-

**19.** In *Winters v. Miller,* this court held that a competent involuntarily admitted mental patient stated a claim under 28 U.S.C. § 1343(3) and 42 U.S.C. § 1983, for having been medicated over her religious objection. In so holding, the court observed that the state's *parens patriae* powers could not be exercised to force treatment under such circumstances without a judicial determination of incompetency. 446 F.2d at 71. It should be noted that under current New York State regulations, an involuntarily committed mental patient may not be given treatment over religious objection without a court order. 14 N.Y.C.R.R. § 27.8(b)(3)(ii).

**20.** With respect to incompetents, the Supreme Judicial Court ruled that refusal could be overridden only if the guardian obtained a judicial determination of substituted judgment. 383 Mass. at ——, 421 N.E.2d at 51–52. The court identified five factors which it considered in deciding *Roe III:* "(1) the intrusiveness of the proposed treatment, (2) the possibility of adverse side effects, (3) the absence of an emergency, (4) the nature and extent of prior judicial involvement, and (5) the likelihood of conflicting interests." *Id.* at ——, 421 N.E.2d at 52.

**21.** The state court described this right of privacy as " 'an expression of the sanctity of individ-

ual free choice and self-determination as fundamental constituents of life.' " 383 Mass. at ——, 421 N.E.2d at 51 n. 9 (quoting *Superintendent of Belchertown State School v. Saikewicz,* 373 Mass. 728, 742, 370 N.E.2d 417, 426 (1977)). The court also found support "in the inherent power of the court to prevent mistakes or abuses by guardians, whose authority comes from the Commonwealth and the courts ... [and] ... the common law right of every person 'of adult years and sound mind ... to determine what shall be done with his own body.' " 383 Mass. at ——, 421 N.E.2d at 51 n. 9 (citations omitted).

**22.** The court observed that "[b]ecause of both the profound effect that these drugs have on the thought processes of an individual and the well-established likelihood of severe and irreversible adverse side effects, we treat these drugs in the same manner as we would treat psychosurgery or electro-convulsive therapy." 383 Mass. at ——, 421 N.E.2d at 53. New York State regulations require informed consent only in the case of electro-convulsive therapy, surgery, major medical treatment or experimental medication. *See* 14 N.Y.C.R.R. §§ 27.8, 27.9.

ed directly by the Constitution . . . and that these interests are implicated by the involuntary administration of antipsychotic drugs," 457 U.S. at 299 n. 16, 102 S.Ct. at 2448 n. 16 (citing *O'Connor v. Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 45 L. Ed.2d 396 (1975)). The Court vacated the circuit court's ruling and remanded the case, noting that "[b]ecause of its greater familiarity both with the record and Massachusetts law, the Court of Appeals is better situated than we to determine how *Roe III* may have changed the law of Massachusetts and how any changes may affect this case." 457 U.S. at 306, 102 S.Ct. at 2452. In reaching this result, the Supreme Court observed that "the substantive rights provided by the Federal Constitution define only a minimum [and] State law may recognize liberty interests more extensive than those independently protected by the Federal Constitution." *Id.* at 300, 102 S.Ct. at 2449. The Court, in "assuming" the existence of the liberty interests in question, "intimate[d] no view as to the weight of such interests in comparison with possible countervailing state interests." *Id.* 299 n. 16, 102 S.Ct. at 2448 n. 16.

Although *Mills* did not definitively resolve the question of whether a liberty interest in refusing antipsychotic medication exists as a federal constitutional matter, the case appears to indicate that there is such an interest. In any event, it is clear that such an interest can be created as a matter of state law. In the case at bar, the district judge, citing *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 2458, 73 L.Ed.2d 28 (1982) (involuntarily committed mentally retarded individual has constitutionally protected liberty interest in freedom from bodily restraint), observed that "[f]orcible medication can alter mental processes and limit physical movement, and therefore is analogous to bodily restraint." 551 F.Supp. at 1309.

Whether we adopt such an analogy or not, it appears that New York State recognizes the right. In *Mills,* the Supreme Court noted:

As a practical matter both the substantive and procedural issues are intertwined with questions of state law. In theory a court might be able to define the scope of a patient's federally protected liberty interest without reference to state law. Having done so, it then might proceed to adjudicate the procedural protection required by the Due Process Clause for the federal interest alone. For purposes of determining actual rights and obligations, however, questions of state law cannot be avoided.

457 U.S. at 299, 102 S.Ct. at 2448–49 (citations omitted). We are not faced here, as was the *Mills* Court, with an intervening state court ruling bearing on the liberty interest question. However, the existence in New York State of a right to refuse medication may be gleaned from the regulations providing for objection to treatment. See 14 N.Y.C.R.R. §§ 27.8, 27.9. As Judge Neaher noted, "State regulation provides for a right to object to treatment, and that right already encompasses any substantive due process right that might exist." 551 F.Supp. at 1309; see also M.H.L. § 33.03(a) ("Each patient in a facility and each person receiving services for mental disability shall receive care and treatment that is suited to his needs and skillfully, safely, and humanely administered *with full respect for his dignity and personal integrity.*") (emphasis added). The district judge also pointed out that this right is not absolute, but must be balanced by relevant state interests. This conclusion brings us to' the second part of our inquiry—whether an involuntarily committed mental patient's right to refuse treatment with antipsychotic medication is sufficiently protected by New York State procedures. *See Youngberg,* 102 S.Ct. at 2452. In our view, the New York regulations, 14 N.Y.C.R.R. §§ 27.8, 27.9, on their face, meet minimum due process standards.

While we are aware that deference must be accorded medical judgment in such matters, *see Parham,* 442 U.S. at 607, 99 S.Ct. at 2506, we are also mindful that "[t]he medical nature of the inquiry . . . does not justify dispensing with due process requirements." *Vitek,* 445 U.S. at 495–96, 100 S.Ct. at 1265. In assessing the constitutional validity of New York procedures in this regard, we find guidance in *Rennie v. Klein,*

653 F.2d 886 (3d Cir.1981) (en banc), *cert. granted and judgment vacated and remanded in light of Youngberg v. Romeo,* 458 U.S. 1119, 102 S.Ct. 3506, 73 L.Ed.2d 1381 (1982). In *Rennie v. Klein,* 476 F.Supp. 1294, 1309–12 (D.N.J.1979), the district court had found constitutionally deficient the New Jersey procedures pertaining to involuntary patients' right to refuse treatment,[23] and mandated certain additional procedures. The United States Court of Appeals for the Third Circuit disagreed with the district court's imposition of additional requirements and, applying the due process test for evaluating state administrative procedures set forth in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976),[24] held that the previously existing procedures satisfied due process. 653 F.2d at 851. In reaching this conclusion, the court applied a "least intrusive means standard" for balancing the individual's interest in freedom from forcible medication against the interests of the state. The court noted that "[t]he means chosen to promote the state's substantial concerns must be carefully tailored to effectuate those objectives with minimal infringement of protected interests." *Id.* at 846.

As noted above, the Supreme Court granted certiorari and remanded the case to the circuit court for further consideration in light of *Youngberg.* The *Youngberg* Court, in considering the proper standard for assessing whether a state adequately has protected an involuntarily committed mentally retarded individual's interest in freedom from bodily restraint, observed: "[T]he standard requiring that *'the courts make certain that professional judgment in fact was exercised'* affords the necessary guidance and reflects the proper balance between the legitimate interests of the State and the rights of the involuntarily committed to reasonable conditions of safety and

freedom from unreasonable restraints." *Id.* 102 S.Ct. at 2461 (quoting *Romeo v. Youngberg,* 644 F.2d at 178 (Seitz, Chief Judge, concurring)) (emphasis added). The Court added: "'It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made.'" *Id.* The *Youngberg* Court concluded:

> Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish. At the same time, this standard is lower than the "compelling" or "substantial" necessity tests the Court of Appeals [majority in *Romeo v. Youngberg* ] would require a state to meet to justify use of restraints or conditions of less than absolute safety.

102 S.Ct. at 2461.

We find that the standard articulated by the Supreme Court in *Youngberg* provides guidance as to how we must evaluate the standards set forth for objecting to treatment in New York State. That the Supreme Court, on petition for certiorari, remanded *Rennie v. Klein* to the United States Court of Appeals for the Third Circuit for further consideration in light of *Youngberg,* leads us to conclude that the procedural scheme must at least provide sufficient opportunity for professional input.

 The New York State regulations, 14 N.Y.C.R.R. §§ 27.8 and 27.9, provide for three levels of review by medical personnel other than the treating physician. In addition, patients are permitted to have legal counsel or another interested person represent them at all levels of the appeal process, and the MHIS is to be kept informed at each step of review. We find

---

**23.** The procedures regarding non-emergency forced administration of psychotropic drugs to involuntary mental patients (not adjudicated incompetent) are set forth in Administrative Bulletin 78–3 of the New Jersey Division of Mental Health and Hospitals. *See Rennie,* 462 F.Supp. at 1149–50.

**24.** In *Mathews v. Eldridge,* the Supreme Court set forth three factors to be applied in assess-

ing the adequacy of state agency proceedings under the due process clause: (1) the private interest implicated; (2) the risk of an erroneous decision through the procedures used and the probable value, if any, of additional or substituted safeguards; and (3) the governmental interest, including financial and administrative burdens, that such additional or substitute requirements would entail. 424 U.S. at 335, 96 S.Ct. at 903.

that these procedures, on their face, satisfy due process. In *Parham,* 442 U.S. at 607, 99 S.Ct. at 2506, the Supreme Court noted that "due process is not violated by use of informal, traditional medical investigative techniques." The *Parham* Court recognized:

the fallibility of medical and psychiatric diagnosis ... [but did] not accept the notion that the shortcomings of specialists can always be avoided by shifting the decision from a trained specialist using the traditional tools of medical science to an untrained judge or administrative hearing officer after a judicial-type hearing. Even after a hearing, the nonspecialist decisionmaker must make a medical-psychiatric decision. Common human experience and scholarly opinions suggest that the supposed protections of an adversary proceeding to determine the appropriateness of medical decisions for the commitment and treatment of mental and emotional illness may well be more illusory than real.

*Id.* at 609, 99 S.Ct. at 2507. This is not to say that medical experts are to enjoy unfettered discretion in forcibly medicating involuntarily committed mental patients. Indeed, at a minimum, an opportunity for exercise of professional judgment must be provided, *see Youngberg,* 102 S.Ct. at 2461; *Rennie,* 653 F.2d at 854 (Seitz, Chief Judge, concurring). New York's procedures provide such an opportunity. In addition, in our view, due process requires an opportunity for hearing and review of a decision to administer antipsychotic medication—but such a hearing need not be judicial in nature. New York already provides for such review, and we find that due process does not require more.[25] *See Parham,* 442 U.S. at 608–09, 99 S.Ct. at 2507. In view of the standards enunciated by the Supreme Court in *Youngberg* and *Parham,* we conclude

that the procedures set forth in 14 N.Y.C. R.R. § 27.8 withstand appellants' federal constitutional challenge.

## IV. CONCLUSION

We have considered all of appellants' arguments, and for the reasons set forth above, we affirm the decision of the district judge. No costs.

---

25. We intimate no views as to whether the procedures already provided for in 14 N.Y.C. R.R. § 27.8 sufficiently protect patient rights as set forth in M.H.L. §§ 33.01, 33.03. Such a determination, in our opinion, would be best addressed by the state legislative, executive and judicial processes. Nor need we address at this time the question of whether a proceeding pursuant to Article 78 of the New York Civil Practice Law and Rules, N.Y.Civ.Prac.Law § 7801 (McKinney 1981), would be available to an involuntary patient once he has exhausted the administrative appeal process of 14 N.Y.C. R.R. § 27.8. *Cf. In the Matter of Torsney,* 66 A.D.2d 281, 295 n. 10, 412 N.Y.S.2d 914, 922 n. 10 (2d Dep't) (determination by Commissioner of Mental Hygiene appropriate subject for judicial review in an Article 78 proceeding), *rev'd on other grounds,* 47 N.Y.2d 667, 394 N.E.2d 362, 420 N.Y.S.2d 192 (1979).